# CHARLESTON.

## MOORE *et al. v.* STRICKLING.

### Submitted February 6, 1899—Decided April 22, 1899.

1. REMOVAL OF PUBLIC OFFICER—*Jury Trial.*
   Under the provisions of chapter 48 of the Acts of 1897, an officer against whom charges are preferred under the supervision of the circuit court is not entitled to a jury trial. (MCWHORTER, JUDGE, dissenting.)  (p. 520).

2. PUBLIC OFFICE—*Constitutional Law—Property.*
   A public office is not property, within the meaning of the constitutional provision that "no person shall be deprived of life, liberty or property without due process of law and the judgment of his peers." It is a mere public agency, revocable according to the will and appointment of the people, as expressed in the constitution and the laws enacted in conformity therewith. (p. 519).

3. GROSS IMMORALITY.
   Gross immorality is willful, flagrant, or shameless immorality. (p. 525.)

4. PUBLIC OFFICER—*House of Ill Fame—Gross Immorality.*
   If a public officer, whose duty it is to prosecute the keeper and inmates of a house of ill fame, resorts to the same for immoral

pnrposes, he is guilty of gross immorality, and thereby forfeits his office.   (p. 526).

5. REVIEW ON APPEAL—*Evidence.*
 The credibility of witnesses and the weight of evidence are for the trial court, and the Appellate Court will not disturb its finding, unless plainly contrary to the preponderance of the evidence. (p. 526).

Error to Circuit Court, Tyler County.

Application of S. Moore and others for the removal from office of James H. Strickling, prosecuting attorney. From the judgment of removal, defendant brings error.

*Affirmed.*

T. P. JACOBS and D. F. PUGH, for plaintiff in error.

HOWARD & HANDLAN, for defendants in error.

DENT, PRESIDENT:

On the 22d day of July, 1898, J. H. Strickling, prosecuting attorney of the County of Tyler, was found guilty of gross immorality by the circuit court of such county, under the following specification and charge, denominated specification No. 25, to wit: "It is further charged and averred that during all the year 1897, and during which time James H. Strickling was prosecuting attorney of the county of Tyler, he was grossly immoral and guilty of grossly immoral conduct in this:   That he did on divers occasions visit a certain house of ill fame in the town of Sistersville, county of Taylor, in the state of West Virginia, then and there kept by one Nellie White; that on several occasions during the year 1897 he remained in the said house of ill fame all night, drinking excessively, and conducting himself in a grossly immoral manner, with a number of lewd men and women living and associating together in the said house," —and thereupon removed from said office.   The charge was preferred by several private citizens of the county.   The defendant obtained a writ of error to this Court.

The first error relied on is the refusal of the circuit court to allow the defendant a trial by jury by virtue of section 10, Art. III., Constitution, to wit: "No person shall be deprived of life, liberty or property without due process of law and the judgment of his peers."   The defendant claims that his office is his property, and it is subject to

this provision of the Constitution. In support of such claim he relies on the opinion of Judge Green in the case of *Dryden* v. *Swinburn*, 15 W. Va. 248, where he uses the language that a public office is a franchise, and therefore property, and also *Phares* v. *State*, 3 W. Va. 567, where it was held that an incumbent had a vested right in his office. These are but mere intimations that the right to exercise an office is a matter of value, and were not intended to establish the doctrine that such right, however valuable, is property, within the meaning of the constitution. In Throop, Pub. Off. section 16, it is said: "Many ancient offices were in England inheritable and assignable, and were treated as incorporeal hereditaments. But these were common-law offices, depending chiefly upon usage; and the doctrine did not extend to judicial offices or other offices pertaining to the administration of justice. Offices created by statute confer no life estate or irrevocable tenure, unless the statute expressly so provides." In section 17 it is said no office in the United States is a hereditament, and in section 18: "But in some American cases the office, or the right to exercise an office, is styled property in an absolute and unqualified sense, and it has been said that the right to exercise an office is 'as much a species of property as any other thing capable of possession.' With respect to this remark a learned judge says that 'it was rather a figure of speech than a judgment determining an office to be property. It was a strong mode of expressing the right which one elected to an office has to hold and enjoy it against all intruders and unfounded claims, which is as perfect a right, beyond doubt, as the title of any individual to his property, real or personal. But the nature of that right and its liability to control by legislative action is quite a different thing.' And in a recent case in the New York court of appeals, Andrew, Judge, approving the remarks last cited, adds: 'It is true that in this country offices are not hereditaments, nor are they held by grant. The right to hold an office and to receive the emoluments belonging thereto does not grow out of any contract with the state, nor is an office property in the same sense that cattle or land are the property of the owners.' An office has a pecuniary value, although primarily it is an agency for public purposes." "An office is a mere right to ex-

ercise a public function or employment, though it is an entity and may exist in fact, though it be without an incumbent, and it is not property; nor are the prospective fees of an office the property of the incumbent; nor is it a subject of sale, purchase, or incumbrance." 19 Am. & Eng. Enc. Law, 381. In the case of *State* v. *Hawkins*, 44 Ohio St., on page 109, 5 N. E. 233, Judge Minshall says: "The incumbent of an office has not, under our system of government, any property in it. His right to exercise it is not based upon any contract or grant. It is conferred on him as a public trust, to be exercised for the benefit of the public. Such salary as may be attached to it is not given because of any duty on the part of the public to do so, but to enable the incumbent the better to perform the duties of his office by the more exclusive devotion of time thereto." This view is sustained by the decided and overwhelming weight of authority.

In the case of *Donahue* v. *Will Co.*, 100 Ill. 94, it is said: "It is impossible to conceive how, under our form of government, a person can own or have title to a governmental office. Offices are created for the administration of public affairs. When a person is inducted into an office, he thereby becomes empowered to exercise its powers and perform its duties, not for his, but for the public benefit. It would be a misnomer and a perversion of terms to say that an incumbent owned an office or had any title to it." *State* v. *McGarry*, 21 Wis. 496; *State* v. *Prince*, 45 Wis. 610; *Keenan* v. *Perry*, 24 Tex. 253; *State* v. *Doherty*, 25 La. Ann. 119; *Taft* v. *Adams*, 3 Gray, 126; *Ex parte* Wiley, 54 Ala. 226; *Thompson* v. *Holt*, 52 Ala. 491; *State* v. *Frazier*, 48 Ga. 137; *Dougan* v. *District Court*, 22 Am. Law Reg. (N. S.) 528; *Patton* v. *Vaughan*, 39 Ark. 211; *People* v. *Stratton*, 28 Cal. 382; *Woods* v. *Varnum*, 85 Cal. 639, (24 Pac. 843): *Smith* v. *Mayor, etc.*, 37 N. Y. 518; *Conner* v. *Same*, 5 N. Y. 285; *State* v. *Davis*, 44 Mo. 129; *Prince* v. *Skillin*, 71 Me. 361; *People* v. *Murray*, 70 N. Y. 521; *Rankin* v. *Jauman* (Idaho) 36 Pac. 502; 6 Am. & Eng. Enc. Law (2nd Ed.) 981. Some of the decisions have adopted the theory that an office is property, under the mistaken view that the common-law doctrine that an office is a hereditament applied to the offices of this country, which is undoubtedly fallacious. *Plimpton*

v. *Somerset*, 33 Vt. 283; *Board* v. *Pritchard*, 36 N. J. Law, 101; *Page* v. *Hardin*, 8 B. Mon. 672; *Com.* v. *Slifer*, 25 Pa. St. 28,—are cases of this character. In North Carolina it is held that an office is property, and that the incumbent has the same right to it that he has to any other property (*King* v. *Hunter*,65 N. C. 603), subject, however, to legislative control in all that concerns the interests of the public(*Hoke* v. *Henderson*, 15 N. C. 1). In the late case of *Attorney General* v. *Jochim*, 99 Mich. 358, (58 N. W. 611,) the supreme court of Michigan held: "A public office cannot be called 'property,' within the meaning of section 1 of the fourteenth amendment to the Constitution of the United States and section 32 of article 6 of the Constitution of Michigan, which provide that no person shall be deprived of life, liberty, or property without due process of law." In the still later case of *People* v. *Akin*, 49 N. E. 229, it is held by the supreme court of Illinois, on an exhaustive review of authorities, that "the trial of charges against officers for their removal is not within the constitutional provision of trial by jury. A public office, or the prospective fees of an office, are not the property of the incumbent, within the constitutional provision against depriving a man of property. The constitutional provision for trial by jury does not apply to special summary jurisdictions, unknown to the common law, and not providing that mode of trial." Public offices belong to the people, and are to be both conferred and taken away according to their will and appointment, and a person who accepts a public office does so subject to all the constitutional and legislative provisions in relation thereto. *Attorney General* v. *Jochim*, cited. The Constitution provides, in Art. IV., section 6, that "all officers elected or appointed under this constitution may, unless in cases herein otherwise provided for, be removed from office for official misconduct, incompetence, neglect of duty or gross immorality in such manner as may be prescribed by general law." That is, the removal must be in the due and orderly course of law, satisfying the requirements of due process of law, or the law of the land. *Attorney General* v. *Jochim*, cited *Jelly* v. *Dils*, 27 W. Va. 267; *Ex parte Wall*, 107 U. S. 265, (2 Sup. Ct. 569). By "due process of law" is meant "laws general in their operation, and not special acts of legislation passed to affect the

rights of particular individuals, against their will, and in a way in which the same rights of others are not affected by existing laws." *Sears* v. *Cottrell*, 5 Mich, 251. "Due process of law does not require a plenary suit and trial by jury in all cases where property and personal rights are involved." *Ex parte Wall*, cited. The State cannot be so bound by the term "due process of law" in the constitution that it is impossible for it to invest its agents with its offices, without subjecting itself to the delays and uncertainties of strict judicial action in cases where the official is abusing his agency and trust, to the injury and disgrace of the public service. It is well settled that all appointive officers may be removed by the appointing power; that all high constitutional officers may be removed by impeachment; and that other county officers, except the clerk of the circuit court, prosecuting attorney, sheriff, surveyor of lands, and county commissioners, are removable by the county court of the county; and for none of these can jury trial be claimed. Then, why should the five above-named officers be entitled to such trial? The number of state and national officers subject to summary removal are as a legion compared with these five officers, and many of them are of far greater importance. It is true that conviction of any of these officers, under an indictment for malfeasance, misfeasance, or neglect of official duty, by virtue of section 4, Art. IX, Constitution, operates a removal from office; but that does not prevent their summary removal for these or other causes coming under the head of gross immorality without indictment or criminal prosecution. *McDonald* v. *Guthrie*, 43 W. Va. 595 (27 S. E. 844.) Chapter 48, Acts 1897, provides that "upon satisfactory proof of the charges made in writing the court having jurisdiction shall remove any such officer from the discharge of the duties of his office." This provision wholly excludes the idea of a jury trial, and plainly imposes on the court, in the person of the judge thereof, the duty of investigating the matter, hearing the evidence, and, if satisfied of the truth of the charge, removing the incumbent.

The defendant moved to quash the charges for insufficiency. While not required to be set out in the strict form of an indictment, they should be sufficiently explicit to give the defendant notice of what he is required to answer. See cases heretofore cited. Specification No. 25 explicitly in-

forms him that he must answer the charge of grossly im-
moral conduct in this: That he  did on divers occasions
during the year 1897, and while he was prosecuting attor-
ney, "visit a certain house of ill fame in the town of Sis-
tersville, county of Tyler, in the state of West Virginia,
then and there kept by one Nellie White; that on several
occasions during the year 1897 he remained in the said
house of ill fame all night, drinking excessively, and con-
ducting himself in a grossly immoral manner, with a num-
ber of lewd men and women living and associating together
in the said house." The defendant says that, admitting
these averments to be true, they do not establish gross im-
morality; that to visit a house of ill fame, and drink and
carouse and do other immoral acts with lewd men and
women, was not gross immorality, but was, to say the most,
foolish or imprudent. This charge is explicit enough as
to time, place, and nature. And this brings us to the very
important consideration of what standard of morality
should govern in such cases. In commenting on the noble
sentiment of Kant, "There are two things which the more
I contemplate them, the more they fill my mind with ad-
miration,—the starry heavens above me and the moral law
within me," Judge Dillon, in his Commentary on the Laws
and Jurisprudence of England and America, says: "Not
less wondrous than the revelations of the starry heavens,
and much more important, and to no class of men more so
than lawyers, is the moral law which Kant found within
himself, and which is likewise found within, and is con-
sciously recognized by, every man. This moral law holds
its dominion by divine ordination over us all, from which
escape or evasion is impossible. This moral law is the
eternal and indestructible sense of justice and of right writ-
ten by God on the living tablets of the human heart and
revealed in his Holy Word" Mr. Blackstone, in his Com-
mentaries (page 41), says: "If our reason were always, as
in our first ancestor before his transgression, clear and per-
fect, unruffled by passions, unclouded by prejudice, unim-
paired by disease or intemperance, * * * we should
need no other guide. * * * But every man now finds
the contrary in his own experience,—that his reason is cor-
rupt and his understanding full of ignorance and error."
This, as the author argues, made it necessary for benign
Providence to discover and enforce its laws by an immedi-

ate and direct revelation. These precepts are contained only in the Holy Scriptures, and on examination and comparison by unclouded reason they are found to be a part of the original law of nature, as "they tend in all their consequences to man's felicity." On page 65, Shars. Bl. Comm., it is said that the illustrious King Alfred adopted the Ten Commandments as the foundation of the early laws of England, contained in his Doom Book. These commandments, which, like a collection of diamonds, bear testimony to their own intrinsic worth, in themselves appeal to us as coming from a superhuman or divine source, and no conscientious or reasonable man has yet been able to find a flaw in them. Absolutely flawless, negative in terms, but positive in meaning, they easily stand at the head of our whole moral system, and no nation or people can long continue a happy existence in open violation of them. To them, however, there are two widely different interpretations, both claiming to be moral; that is, the just and true rule for the conduct of man, to secure him the greatest happiness in harmony with the conditions of his existence. The first is, though second in time, what is presented as truly the divine interpretation. It is given to man by Christ, who represents that he came, not to destroy the law, but to fulfill and by precept and example to illustrate and make plain its true meaning and force according to the divine will. It is positive in its nature and is founded on the broad fundamental principle that no man belongs to himself, or has the right to do as he pleases with himself, but that he holds his body, mind, soul, and property of every description, by divine grant, in trust for the benefit of his fellow men. It requires the doing of good at all times, the love of enemies, the giving to him that asketh, the loaning to any one that would borrow without the expectation of any return, and the complete devotion of self to the commonweal of humanity and the establishment of a kingdom of perfect righteousness. It condemns resistance to evil. War under any plea, even for humanity's sake, it does not justify, but condemns in unmistakable terms. It goes still further, enters the human heart as the foundation of all evil, and denounces the very conception thereof without overt act. It destroys all distinction between morality and religion. It makes the laws of morality concur fully with

laws of religion. According to it, he who serves man best worships God best, and he who worships God best serves man best. All other religion it denounces as pure hypocrisy. Because of their incapacity to understand it through inability to live it, men deny it or wrest its meaning to suit their living, of whom it is said: "Ye are they which justify yourselves before men, for God knoweth your hearts; for that which is highly esteemed among men is an abomination in the sight of God." Its ostensible purpose is to make men perfect in all their conduct as their Creator is perfect. Man's environment, including his heritage and hereditary traits of character, customs, laws, business relations, and acquired necessities, is to an almost immeasurable degree directly opposed thereto. Hence they are immoral, not being in conformity with the will of God, and render man immoral, thus have mankind woven around themselves, thread by thread, an invisible web, which they are powerless to break. Nor does this interpretation admit of degrees of morality; for all disobedience is equally heinous in the sight of God, and all immorality gross immorality. "Why callest thou me good? There is none good, but one; that is, God. But, if thou wilt enter into life, keep the commandments." To accept it, we are compelled to admit at once that all mankind, either consciously or unconsciously, are guilty of gross immorality. Hence, most men reject it; for they would rather be blind and leaders of the blind, and perish in the same pit, than sit in condemnation of their own lives. To live in accordance with it in the present condition of the world's affairs requires a complete surrender of self, the giving up of worldly pleasures and enjoyments, the repression of all lustful passions and ambitions, and an entire devotion of time, service, and energies to the elevation of mankind, in regaining for them that greater liberty which must follow when the knowledge of truth fills the earth as the waters cover the sea. This interpretation of the laws of morality cannot govern in this case, for it has never been accepted as, or become a part of, the law of the land. If such were the case, we would have no need of prosecuting attorney, judge, or court. The other interpretation, known as the Mosaic, human, or negative, is founded on absolute justice between man and man. It is made necessary by the bold assumption that every

man belongs to himself, and has the right to do as he pleases with himself, so long as he accords the same right to others, and does nothing hurtful to interfere with their enjoyment thereof. In short, that he does not do unto others what he would not have them do unto him. If he does so, he is guilty of immorality, which may be slight or gross, according to circumstances. This interpretation demands "life for life, eye for eye, tooth for tooth, hand for hand, foot for foot, burning for burning, wound for wound, stripe for stripe." While the former is intended to secure perfection, the latter is intended for the government of an imperfect, self-willed, ignorant, stubborn, and hard-hearted people, and for the suppression of vice, injustice, and wrong among them. If all people were truly moral, human laws and government would be unnecessary; for the laws of nature written in their hearts, and perfectly understood by them, would be a sufficient guidance in their dealings with each other. Where no wrongs are committed there exists no necessity for punishment, compensation, or restitution, and human enactments in relation thereto becomes obselete. No man need say to his neighbor, "Know the law;" for all would know it, from the least unto the greatest. But where society is constituted on such an immoral basis as to continually increase the wants and arouse the selfish propensities of mankind, and yet render them proportionately harder of attainment and satisfaction, human law becomes of increasing necessity, to suppress and control these wants and propensities for the common good, otherwise a state of immoral anarchy would be the result, deserving the just condemnation, once requiring his extinction, that the "imaginations of a man's heart are evil continually from his youth up." The morality of our laws is the morality of the Mosaic interpretation of the Ten Commandments, modified only as to the degree or kind of punishment inflicted. In some cases the punishment is less, and in some much severer, yet the underlying morality is the same. With us the punishment of adultery is slight; with Moses it was death. With him punishment for offenses against property was restitution from one to five times the amount; with us it is usually felony where the amount involved exceeds twenty dollars. We seem to have more sympathy for the adulterer and libertine than

the thief, although the crime of the former against society is much the further reaching and more harmful. The people, when free from the baneful influence of political prejudice, exhibit their moral sense in a higher degree than is expressed in their laws; for they justify the avenging of wrong by a father, husband, brother, son, or the victim herself upon the life of a wrongdoer, and they seldom will clothe a known libertine with office, notwithstanding great ability and mental fitness therefor. With the people a known adulterer is an enemy of society, who forfeits his life if caught in the act by one who suffers by his lawlessness; and the adultress becomes an outcast, shunned and despised, as though she wore on her breast the scarlet letter of her shame,—a punishment far more terrible than confinement in prison. The morality of the people is thus more in harmony with the Mosaic interpretation of the moral law than the written laws of this State, and this is a matter for consideration in this case. For the question of gross immortality must be determined according to the common understanding of the ordinary law-abiding and reasonable citizen of the country, and not according to those who are highly developed ethically, or those, on the other hand, who are suffering from moral depravity. The word "gross," as used in this connection, does not mean "great and excessive," but rather willful, flagrant, or shameful, showing a moral indifference to the opinions of the good and respectable members of the community and to the just obligations of the position held by the delinquent. Nor is the immorality involved confined to the question of fitness or unfitness for the office. The other terms used in the constitution, to wit, "official misconduct, incompetence, and neglect of duty," covers fitness or unfitness, or all offenses affecting the offices. The people have the right, and the public service demands, that public offices shall be filled by upright and moral men, and not those, however efficient they may be, who brings the public service into infamy, shame, and disgrace. And there is no other office in which this is more necessary than the office of public prosecutor; for it is his duty to enforce the laws against the lawless, and cause them to have a decent respect for the same, and how can this be if he is counted of their number?

In this, as in all similar cases, the circuit judge saw the witnesses face to face, beheld their demeanor on the witness stand, and heard them testify. On him devolves the duty of determining the credibility of witnesses and weighing their testimony; and, unless the evidence is credited to this Court plainly preponderates against his finding, it will not be disturbed. *Hysell* v. *Manufacturing Co.* (decided at this term) 33 S. E. 95. The finding is undoubtedly sustained by the evidence against the defendant. It is shown that during the year 1897, while prosecuting attorney, he visited the house of ill fame kept by Nellie White, in the town of Sistersville, not on business, but for the purpose of prostitution, that he drank, caroused, and slept with the inmates, and promised the mistress immunity from prosecution, or that he would let her know when the house was to be raided. He denies this, but admits that he visited and drank there, and slept with one of the "girls," before he was elected prosecuting attorney. He is badly contradicted by more than one witness in the case. He has certainly managed to make a very unenviable reputation for himself, and one that it is hard to believe the good people of Tyler County would condone at the polls. If frequenting a house of ill fame, for the purpose of drinking and sleeping with the unfortunate inmates, more sinned against than sinning, by a prosecuting attorney of a county, whose duty it is to prosecute the keeper of such house and the inmates and patrons thereof, is not gross immorality, then such a thing is not known to the law. On the question of immorality, although the punishment is not so severe, almost any other crime is preferable. It is the most debasing and harmful to society, as it tends to destroy all respect for decency and virtue, and drags womanhood down to the lowest depths of degradation, and its demoralizing influence for evil upon the young is beyond computation, and the aged offender finds it the pit of destruction. While it is a harsh measure to remove an incumbent from office, yet he accepted the office on condition of upright behavior, as required in the constitution and laws, and he has no one to blame but himself. If he has been unjustly traduced, there remains for him an appeal to the people, who are quick to remedy such injustice, and readily pardon those whose upright deportment evinces a sincere departure from the fol-

lies of youth. The court cannot do otherwise than con-
scientiously carry out the mandates of the law. The judg-
ment is affirmed.

*Affirmed.*