## IN THE MATTER OF COMPLAINT AGAINST HOMER Z. BOSTWICK, JUDGE.

Common Pleas Court of Franklin County.

Decided September 22, 1931.

[Before the HON. WALTER D. JONES, HON. JAMES C. OGLEVEE and HON. WILLIAM E. VAUGHN, sitting by designation.]

*Newton D. Baker* and *Charles S. Druggan,* for the complainants.

*J. E. Todd* and *Clarence M. Addison,* for respondent.

BY THE COURT.

The complaint in this case is predicated on Section 10-1 of the General Code of Ohio, and charges the respondent, Homer Z. Bostwick with gross immorality, and misfeasance and non-feasance, in certain respects as set forth in the complaint. In substance the complaint and the testimony in support thereof relate to the relations of the respondent with one Opal Eversole, and to his actions and conduct with regard to the recovery of a diamond ring which he had given her. That the respondent, during his brief association with Opal Walker, which began in May and ended in June, bestowed upon the young lady a number of valuable presents, including a diamond ring and an Auburn automobile, is not disputed or denied, and the proof clearly establishes the claim of the prosecution with regard to these particular facts.

The relations, whatever they may have been between the respondent and Opal Walker, were suddenly, and so far as the respondent is concerned, unexpectedly, terminated on or about the 22nd day of June, when Opal Walker secured a marriage license to marry a man by the name of Eversole. Just how this fact was brought to the attention of the respondent the record does not disclose, but he some how obtained that information, for shortly thereafter in his private office, or in some other room connected with the Probate Judge's office, he was demanding, or at least requesting, that the girl return the diamond ring. Mrs. Eversole says she did not say whether she would return the ring or not, but got up and

walked out without giving any answer. The record of what occurred at that meeting is rather meager, and it may not contain all that was said, but it is sufficient to establish the fact that for some reason or other the respondent wanted the diamond ring returned to him.

Not long after this occurrence, Mr. John Cooper enters the picture. He had seen Opal Walker in the court house, possibly in the probate office, shortly before, and for some reason he makes it his business to examine the marriage records, and he makes a note of the number of times Opal Walker has been married, and then he observes that the affidavit which she has just filed contains what he thinks is a false statement with respect to the number of times she has been married. According to his statement he makes a memorandum on a slip of paper with regard to the facts which he is exploring, and puts it in his pocket. He says that at that time he was a very close friend of the respondent, and had been for years, and that he was also a good friend of Opal Walker. Just when he learned that the respondent had given Mrs. Walker a diamond ring and an automobile, he does not state, but he says he did not know of these gifts at that time. He testifies, furthermore, that on the occasion under consideration, he did not talk with the respondent, nor had he any knowledge at that time that the respondent desired the return of the ring. This witness testifies and claims, and would have the court believe, that he acted entirely on his own initiative in all that he did in the probate office that afternoon, and that the respondent was wholly ignorant of that transaction.

If that be true, why did Mr. Cooper want to set the prosecuting attorney on the trail of Mrs. Eversole, his erstwhile friend, and want her brought in on a charge of perjury? What conceivable reason could he have for exploring the marriage records, on his own initiative? And for setting in motion the machinery and the procedure that eventually resulted in the return of the diamond ring? Was it his purpose in carrying an alleged perjury complaint to the prosecuting attorney to secure the conviction of his friend, Mrs. Eversole, and to send her to prison for the commission of a crime?

Just why was he bringing this particular matter to the attention of the public prosecutor? He denies that he was acting for or on behalf of the respondent, or even with his knowledge, but insists that he was preferring a charge of perjury against Mrs. Eversole solely on his own responsibility and initiative. In the light of his acquaintance and close association with both parties, and in the light of subsequent developments, the testimony is incredible, and the court cannot accept as true.

On the other hand, taking into consideration the fact that the respondent was manifestly peeved and disappointed at the unexpected marriage of Mrs. Walker, and wished at least to retrieve the diamond, what would be more reasonable and natural than for him to mention the matter to his close friend, Mr. Cooper, the man who had introduced him to Mrs. Walker and who knew something of their relations, and to consult with him about the situation? Mr. Cooper happened to be in the court house, and in the probate office, just about that time, and while he says he had not known before of the lavish gifts, and denies that he had talked with the respondent at that time at all, it taxes the credibility of the court beyond reason to believe that Mr. Cooper immediately went to the marriage records to look for some evidence of crime against his friend, Mrs. Walker, without any knowledge on the part of the respondent, and without knowing that he was anxious to recover his diamond ring.

But Mr. Cooper does not stop with looking up the record. He makes a memorandum of what he has found there on a slip of paper and puts it in his pocket. Early the next morning he is at Mrs. Eversole's door step wanting to see her. And then he goes to see the prosecuting attorney and puts in his hands the data from the probate records. Mischief is thus set on foot and Mr. Cooper conveniently drops out of the picture. As set forth in the record, the meeting and consultation between Mr. Cooper and Mr. Rubrecht is very brief. Apparently they are both honestly and earnestly endeavoring to bring a criminal to the bar of justice. Mr. Cooper has supplied a complaint from the probate office, now will Mr. Rub-

recht please bring the lady into his office to see what she has to say about it. Forthwith a deputy from the Sheriff's office, and a deputy from the Probate office are dispatched to bring the accused to the prosecutor's office. No affidavit has been filed, and no warrant has been issued, but they have instructions to go out and bring her in.

As a result of the activities of the assistant prosecutor, and the aid and assistance of the sheriff's office, Mrs. Eversole appears before the assistant prosecuting attorney. She is informed officially that a complaint from the probate office charges her with making a false statement in connection with her application for her late marriage license, and then the punishment for perjury is duly and carefully impressed upon her mind. Would she be willing to give up the diamond ring? No, she would not. A ring on the telephone brings Mr. Gordon from the sheriff's office, and he is commanded to take the weeping and hysterical prisoner over to the jail and lock her up, detain her, the prosecutor says. No affidavit is filed and no mittimus is issued to the sheriff.

In due time the prisoner, the sheriff, and Mr. Eversole appear at the prosecutor's office and the ring is laid on his desk. A deputy from the the probate office who happens conveniently to be present, takes the ring down to the probate office for identification by the respondent, and presently he returns to the prosecutor's office with a satisfactory message, and thereupon after a short controversy about signing a mutual release, the prisoner is allowed to depart in peace, and the whole matter is considered settled and at an end.

We hear no more about the falsification of the marriage record. Mr. Cooper is no longer pressing his charge of perjury. Somehow the majesty of the law has been satisfied. The return of a diamond ring purges the prisoner of her transgression, it satisfies Mr. Cooper, it satisfies Mr. Rubrecht, and it satisfies the respondent.

It is perfectly apparent that this whole thing was a set-up to coerce Mrs. Eversole to surrender the diamond ring. It is so transparent that it is not even plausible. The farcial character of this whole transaction appears

not only from what these witnesses claim they said, but from many things they neglected to mention, or denied, as well as from their demeanor on the witness stand. It was a prostitution of the prosecutor's office to a base purpose, amounting to malfeasance in office, which is the doing of an act wholly wrongful and unlawful. It also comes within the definition of misfeasance, which is defined to be "the wrongful and injurious exercise of lawful authority, or the doing of a lawful act in an unlawful manner".

Taking into consideration all the facts and circumstances disclosed by the record, and giving to the testimony of the witnesses such weight and credibility as we think it justly deserves, bearing in mind that it is not only our right but our duty to look through forms and fictions in searching for the truth, and judging the facts and circumstances in the light of our knowledge, observation and experience in the affairs of life and the conduct of men and women under the same or similar situations as we have here, we cannot escape the conviction that the respondent iniatiated the proceedings that set in motion the machinery that ultimately resulted in the recovery of his diamond ring. If that be true he cannot escape responsibility for whatever was done, and all that was done by others working in his behalf. It would not be necessary for him to be present or to participate in any subsequent proceedings, nor to even know of their details or character. If a conspiracy existed to which he was a party, he would be bound by the conduct of his confederates in furtherance of their common unlawful purpose. The act of one of several conspirators in furtherance of the conspiracy is the act of all.

A conspiracy is defined as "a combination of two or more persons by some concert of action to accomplish some criminal or unlawful purpose, or some purpose not in itself criminal or unlawful, by criminal or unlawful means." It is more tersely defined by some courts as "a combination for the purpose of doing something unlawful, oppressive, or immoral as a means or an end."

Judging the facts in this case in the light of these definitions we are constrained to find and hold, that there was such a concert of action and understanding between

the respondent and Mr. Cooper as to constitute a conspiracy, a combination that widened sufficiently in its scope as to take in the activities of the prosecutor's office and the sheriff's office, and whose purpose was the intimidations and by threats of criminal prosecution, and by unlawful duress to coerce Mrs. Eversole to surrender property of value which lawfully belonged to her. In this connection it is proper to note that there are two facts that stand out with impressive and convincing force in proof of the respondent's connection with this whole transaction, to-wit, first, his demand of Mrs. Eversole in the probate office that she return his rings; and secondly, its submission to him for identification as the last act, which terminated the proceedings satisfactorily to all parties concerned. He was the first to demand the ring, which no one claims was his property, and he gratefully accepted it as the fruit of a proceeding that virtually amounted to extortion by blackmail.

But laying aside all these matters occuring subsequent to the marriage of Mrs. Eversole, let us consider the acts of these parties from the time of their first asquaintance. They are introduced to each other on the street by Mr. Cooper, a mutual friend; the three lunch together frequently; soon after their first meeting, possibly at the second meeting, the respondent gives the girl money to bet for him on a horse race; in an incredibly short time he loans her his wife's diamond ring; she is so pleased with the ring that he inquires if she would like to have one like it; he takes her to a jeweler and introduces her as a friend of his wife, when they had never met; orders the ring duplicated which is later done and presented to the girl; for sometime thereafter they are frequently driven about the city by their mutual friend Mr. Cooper in his automobile; then the respondent asks Mrs. Walker if she would not like to have a car for herself, and very naturally she replies in the affirmative; she selects the car of her choice and they go to the bank together where the money is drawn out, and while the car cost $1375.00, the respondent generously hands her the sum of $1650.00 with which to pay for the car; soon the respondent and Mrs. Walker are driving about the city together, dining at various places in the evening after the respondent leaves

his office; when they return she drops him out a block or so from his residence in the shadows of the darkness; all this has taken place within the space of some six weeks.

The parties maintain, however, that this was only a matter of friendship, platonic friendship, (whatever that may mean), and that there were no improper relations between them. If this was a purely platonic friendship, why say to his jeweler, "This is a friend of my wife", why not tell him the truth? When they chanced to meet an acquaintance of the respondent why introduce her as his niece? When they had taken a drive why get out of the car a block away instead of at his home, and, in fact, why not take this girl to his wife, openly, own his friendship, and permit his wife to share this friendship?

It is not expected that these parties will go on the witness stand and admit improper relations, nor is it necessary that they do so. As before stated, circumstances surrounding the acts of the parties, and the acts of the parties, speak louder and have a more convincing effect than direct evidence given on the witness stand and in our opinion, taking all the facts and circumstances into consideration with regard to the relations existing between the respondent and Mrs. Eversole, we are of the opinion that their association and relations together were highly, if not grossly, immoral.

Coming now to the application of the law to the facts as we have found them to be, we call attention first, to Article II, Section 38 of the Constitution, which in substance authorizes the legislature to provide for the prompt removal from office of judges and other officers, for any misconduct involving moral turpitude, or for other causes provided by law. That is a wide grant of power, and pursuant thereto the Legislature did enact Section 10-1 of the General Code, which provides in substance that, any public officer who is guilty of gross neglect of duty, gross immorality, drunkenness, misfeasance, malfeasance, or nonfeasance, shall be deemed guilty of misconduct in office, and upon complaint and hearing he shall forfeit the same.

The Constitution does not say, and the statute does not

provide, that misconduct involving moral turpitude, or gross immorality, shall be connected with his office, or arise out of his official acts, or shall be so limited. We take it that when the Legislature declared that a public officer who is guilty of gross immorality, or drunkenness, shall be deemed guilty of misconduct in office, it had in mind. not only his conduct in connection with his official duties, but his moral conduct in his general relations to society, otherwise the statute would certainly have specifically provided that only such acts and conduct as are connected with his official duties, shall be ground for removal. From the language of the statute we think it has a much broader scope, and includes not only misconduct in office, strictly speaking, but also gross immorality, and misconduct involving moral turpitude, practiced outside his office and in no wise connected with his official duties, for it says that any public officer who is guilty of gross immorality shall be deemed guilty of misconduct in office.

"Moral turpitude" is defined as an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow man, or to society in general, contrary to the accepted and customary rule of right and contrary to the accepted and customary rule of right and duty between man and man. *State* v. *Mason*, 43 Pac. 651; *Baxter* v. *Moore*, 76 N. Y. Supp. 982.

"Moral turpitude" is otherwise defined by another court as anything done contrary to justice, honesty, principle, or good morals. The crime of extortion involves moral turpitude. *In re Disbarment of Coffey*, 123 Ga. 522.

"Gross" as used in modifying the word "immorality" does not mean great and excessive, but rather willful, flagrant or shameless, showing a moral indifference to the opinions of the good and respectable members of the community and to the just obligations of the position held by an officer. *Moore* v. *Strickling* 46 W. Va. 515; 50 L. R. A. 279; and 37 S. E., 274.

"Immoral" as defined by the standard dictionary is hostile to the welfare of the general public, and Bouvier defines immorality as "that which is contrary *bonos mores*, and an agreement to suppress the prosecution of a crimi-

nal offense, whether a felony or a misdemeanor, is immoral conduct." *Jones v. Dannenberg Co.*, 37 S. E. 729; 112 Ga. 426; 52 L. R. A. 271, 274.

With these definitions in mind, we are led to the conclusion that the acts of intimidation, coercion and extortion practiced by the assistant prosecuting attorney, constituted gross immoralty and misconduct involving moral turpitude. And since we have found that these activities were the result of concerted action to which the respondent was a party both at the beginning and at the end, it necessarily follows that he must be held responsible for and charged with gross immorality and must therefore, in the language of the statute "be deemed with misconduct involving moral turpitude, and he guilty of misconduct in office."

We could return the respondent to his bench, but we cannot return to him the high character, confidence and esteem in which he has heretofore been held by the good people of Franklin County. The people expect, and have a right to expect that the judges in all the courts be men of the highest moral character and unsullied reputations, and this especially true of the judges who presides in the Probate Court. The Probate Court has in charge the settlement of estates for the widow and fatherless; the court that looks after the persons and property of minors; the matters coming before this court are mainly *ex parte*, and the widows and children look to the Judge for advice and direction. This judge's character should be without blemish and his reputation untarnished.

We are unanimously of the conviction that the facts and circumstances before us not only justify but demand the removal of the respondent from the office which he now holds.

It is therefore, the finding, judgment, order and decree of the court, that the respondent, Homer Z. Bostwick, has by reason of misconduct involving moral turpitude, and gross immorality, been guilty of misconduct in office, and judgment of forfeiture of his said office as Judge of the Probate Court of Franklin County, Ohio, with all its emoluments is entered against him, and said office is declared by the court to be now vacant.