211 So.2d 641 (1968)
252 La. 540
STATE of Louisiana ex rel. Jack P. F. GREMILLION, Attorney General of the State of Louisiana,
v.
Malcolm V. O'HARA, Judge of Section "A" of the Criminal District Court for the Parish of Orleans, State of Louisiana.
No. 48936.
Supreme Court of Louisiana.
June 4, 1968.
Rehearing Denied June 28, 1968.
*642 Jack P. F. Gremillion, Atty. Gen., William P. Schuler, John E. Jackson, Jr., Thomas W. McFerrin, Henry J. Roberts, Jr., John M. Currier, Asst. Attys. Gen., Lawrence L. McNamara, Sp. Counsel, New Orleans, for State of Louisiana, petitioner.
New Orleans Bar Association amicus curiae.
Edward A. Wallace, Russell J. Schonekas, New Orleans, for Judge Malcolm V. O'Hara, respondent.
BARHAM, Justice.
Under the mandate of Article 9, Section 5, of the Louisiana Constitution of 1921, the Attorney General instituted this action upon the written request of more than 25 citizens and taxpayers from the proper election district to have Malcolm V. O'Hara removed from the position of judge of the *643 Criminal District Court for the Parish of Orleans, Section "A". We have original jurisdiction of this proceeding under Article 7, Section 10, and we appointed as commissioner to take testimony in the matter Mr. Michael M. Irwin, of the Louisiana State Bar Association and the New Orleans Bar.
Witnesses who were duly summoned appeared and testified before the commissioner, and the transcribed testimony and complete record are now before us. The several volumes of testimony reflect numerous objections to certain evidence. However, the parties have agreed that the objections should go to the weight of the evidence, and do not rely upon technical considerations of the objections.
The State bases this removal proceeding on the contention that the defendant judge is guilty of gross misconduct in his private affairs which should subject him to removal by this court.[1] Although there were many allegations of misconduct in the petition, the State in argument before this court relies upon nine particulars of misconduct, contending that the judge should be removed for the following reasons:
"(1) The practice of law while a judge.
"(2) Association with a known convicted felon.
"(3) Attempts to gain evidence involving a Court proceeding.
"(4) Use of the office of Judge of the Criminal District Court of the Parish of Orleans as an influence to obtain or attempt to obtain evidence of wire tapping: The Partin Incident.
"(5) Failure to abide by the warnings of his association with Strate, a known convicted felon given to him by members of the Bar.
"(6) Participation in a meeting to aid and assist a convicted felon in obtaining evidence to be used in a court proceeding: The Sheridan Incident.
"(7) The conspiracy and concerted effort and plan with one Gill to obtain testimony to set aside Hoffa-Strate conviction: And the conspiracy with Zachary A. Strate to obtain testimony to set aside the Hoffa-Strate Convictions.
"(8) The acceptance by the defendant of gifts and gratuities from a person known to him to be a convicted felon. The defendant, being a public official of the State of Louisiana, to-wit: A Judge in a court of Record."
The ninth contention of the State, alleged in its amended petition, is that the defendant should be removed from office if he relied upon the Fifth Amendment in a refusal to testify before a federal grand jury. Since we have previously disposed of this matter by ruling upon the admissibility of certain testimony and the necessity for answering certain interrogatories, it will not be considered. See Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), and Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967).
It is not difficult to ascertain the facts as disclosed by the record. There is really very little variance in the testimony, and where there is variance, we are able to make a finding of fact without great difficulty. The following is a statement of the pertinent facts of the case.
Malcolm V. O'Hara became judge of Section "A" of the Criminal District Court for the Parish of Orleans on September 25, 1962. On October 11, 1967, the defendant *644 O'Hara was granted a leave of absence by this court. On October 18, 1967, the petition for removal was filed. It is not contended or even implied that the defendant is guilty of any "high crimes and misdemeanors in office, incompetency, corruption, favoritism, extortion, or oppression in office * * *". Indeed, the evidence supports the statement in the amicus curiae brief of the New Orleans Bar Association, filed in support of the State's position, that:
"* * * Judge O'Hara apparently has discharged his judicial functions in the court room with efficiency and impartiality * * *."
The state contends that the actions above delineated are supported by the evidence and constitute "gross misconduct".
All of the conduct complained of arose out of the relations of the defendant O'Hara with one Zachary A. Strate, Jr., which began in 1965. Zachary Strate, a contractor, was convicted in a federal court in Illinois for mail and wire fraud and conspiring to defraud in 1964.[2] O'Hara was cognizant of the conviction before meeting Strate. These parties developed a very intimate and personal relationship. It is not contradicted that over a period of approximately two years Strate and O'Hara almost constantly discussed Strate's conviction in the federal court. Strate was obviously interested in overturning the conviction, which was then on appeal. It is also obvious that O'Hara was interested in assisting Strate. Grady Partin, an official of the Teamsters Union in Baton Rouge, had been highly instrumental in the conviction of James R. Hoffa and others in a federal district court in Chattanooga, Tennessee.[3] Many of the attorneys and one of the parties (Hoffa) involved in the Chattanooga trial were also involved in the Chicago trial which resulted in the conviction of Strate. In the early part of 1967 Strate became interested in talking with Partin in regard to whether wiretapping had been used in obtaining the conviction of Hoffa in Tennessee.[4] He *645 asked O'Hara to arrange a meeting with Partin for the purpose of presenting a document or affidavit which would contain statements that wiretapping had been used in that conviction. O'Hara was a close friend of James "Buddy" Gill, former Commissioner of Conservation of the State of Louisiana, who operates a business known as Baton Rouge Industrial Contractors Association. Gill was a close friend of Partin's, and at O'Hara's request made arrangements with Partin for a meeting in Baton Rouge.
The day before the scheduled meeting with Partin, the defendant O'Hara and his court reporter, Julian Levey, met Strate at the Fontainebleau Hotel in New Orleans, and they were introduced to Harold Brown, one of the attorneys involved in the Chattanooga trial. Although O'Hara is restrained in his testimony in regard to this meeting, it is obvious that he knew Brown was coming to New Orleans to assist in carrying out the arrangements previously made for the confrontation of Partin in Baton Rouge in regard to wiretapping. It is also obvious that O'Hara arranged that his court reporter, Levey, would type the instrument to be presented to Partin. O'Hara was present part of the time while Strate and Brown discussed the document to be prepared, and during part of the time while Brown was dictating it to Levey. There is some contradiction in the evidence, but we find that O'Hara had more than a casual knowledge of the matters which were discussed and the work which was done when Brown, Levey, Strate, and he himself met at the Fontainebleau in New Orleans.
On the following day, Saturday, March 3, 1967, these four went to Baton Rouge in Strate's automobile, which was driven by O'Hara. Shortly after their arrival at Gill's place of business in Baton Rouge, Partin arrived, and O'Hara was called into Gill's office, where he was introduced to Partin as "Judge O'Hara from New Orleans". We particularly note that although Strate himself, the attorney Brown, and a neutral party, Levey, were all present in the building when Partin arrived, only O'Hara was called in to meet Partin and to present the document. O'Hara testified that during this meeting (at which only he, Partin, and Gill were present) he said:
"* * * Mr. Partin, I am here with a document which has been prepared by an attorney, and I want you to read it carefully. I want you to consider it, and, if you see fit, you can sign it if you will."
He also testified that after reading the document Partin replied:
"* * * `I can't sign this. * * * I cannot substantiate what is in it.'"
O'Hara's testimony continued:
"There was some conversation by Mr. Partin to the effect `I can't sign this because it is not true', and I told him, I said, `Well, I am only here to get the truth, and, if it is not true, I don't blame you for not signing.'
"He said, `If I sign it, I might become a perjurer.' I said, `I don't blame you for not signing it.'"
Both Partin and Gill testified that O'Hara told Partin not to sign the instrument unless it was true.
The testimony never reveals the exact nature of this document. We find it immaterial, however, whether the instrument was prepared as an affidavit or merely as the basis for obtaining oral statements from Partin. We do make the finding that *646 O'Hara was fully aware of the contents of the instrument and of all the circumstances surrounding and the reasons for the meeting with Partin. We find as a fact that O'Hara went to Baton Rouge to get information from Partin to overturn the conviction of Strate. We find that he also knew that his position as judge might be helpful in obtaining the information.
During the meeting in Baton Rouge Partin suggested to Gill that it would be helpful to see the district attorney of East Baton Rouge Parish, Sargent Pitcher, and Judge William Hawk Daniels. The testimony is at variance as to the reason for seeing these two, but it is uncontradicted that after the meeting Gill did see Pitcher privately while the others waited at a restaurant, and that he later saw Judge Daniels. It was hoped that from these meetings evidence of wiretapping at the Chattanooga trial would be secured, but these efforts were unsuccessful.
The "Sheridan Incident" is the next attempt to secure evidence which involved O'Hara. Walter J. Sheridan had been successively a member of the staff of the Senate Committee on Improper Activities in the Labor-Management Field, and active in the John F. Kennedy for President campaign and in Robert Kennedy's campaign for senator. He was a special assistant to the United States Attorney General from 1961 to 1964, and was actively involved in the Chattanooga trial of Hoffa and others.
In the summer of 1967 Sheridan was in New Orleans as a special correspondent for the National Broadcasting Company to investigate and report on the Garrison investigation of the assassination of President Kennedy. Edward Baldwin, a former law partner of O'Hara, who was interested in helping Sheridan in this investigation, made arrangements for a meeting between O'Hara and Sheridan. However, O'Hara brought his friend Strate to the meeting with Sheridan, and he and Baldwin absented themselves during most of the conversation. The conversation between Strate and Sheridan centered around Strate's willingness to give information to Sheridan concerning the Garrison probe in exchange for information, to help himself or others, that wiretapping had been used in securing evidence in the Chattanooga trial. Sheridan and Strate did not come to any agreement, and no information was exchanged.
When O'Hara was subpoenaed to appear in federal district court in Illinois late in 1967, the testimony sought to be elicited from him concerned this meeting with Sheridan and the parting words of Sheridan and Strate after that meeting. One version of the parting words is that Sheridan said, "Why don't you let me help you in Chicago?" This is supposed to imply that Sheridan had knowledge of wiretapping which would be helpful in the Chicago trial. The other version of the parting words is that Strate said he was interested only in himself, and that Sheridan replied, "That's not the way you told it to me before." This is supposed to imply that Strate was really interested in helping others (Hoffa) when he talked with Sheridan at this meeting.
Finally, it is not disputed, and the testimony clearly establishes, that O'Hara accompanied Strate on at least two trips to Washington, D.C., and one trip to Las Vegas, and that the expenses of these trips were primarily paid by Strate. Meals, drinks, and other similar gratuities were also received by O'Hara from Strate.
Preliminarily we dispose of some of the contentions and arguments which have clouded the issues of this case and which are not pertinent to a decision. It is neither alleged nor proven that Malcolm V. O'Hara tried to get anyone to perjure himself or tried to obtain false evidence to overturn any conviction. It is not a pertinent issue here, then, whether O'Hara was seeking to change someone's testimony or seeking to acquire new testimony. Since the State does not contend, nor does *647 the record reflect, that O'Hara was attemping to obtain false testimony, a recantation of testimony would be of no greater significance than new testimony in this regard.
It should be further noted that it is immaterial whether O'Hara was trying to overturn Strate's conviction or Hoffa's conviction. If it is grounds for removal of a judge for him to attempt to overturn anyone's conviction, it was no worse for O'Hara to seek to overturn Hoffa's conviction than to seek to overturn Strate's. That one party may be more notorious than the other is of no legal consequence in this trial. Thus the overtones and implications surrounding Hoffa's conviction are immaterial.
We now apply the facts previously stated to the contentions of the State as grounds for removal of O'Hara.
It is apparent from the facts previously given that O'Hara did not engage in the practice of law while a judge. O'Hara did assist Strate, but not as a lawyer. The evidence is that Strate used his own attorney or acted upon his own initiative.
It is really immaterial to this court whether Strate was technically a convicted felon or whether the appeal which was pending removed him from the category of a convicted felon. O'Hara admits the close and intimate association with Strate, and admits conduct in behalf of Strate which is far more serious than the mere association with him.
The State's contention No. 5 is that O'Hara should be removed because of failure to abide by the warnings given him by members of the bar concerning his association with Strate. O'Hara admits receiving the warnings from the members of the bar and admits that he did not desist from his association with Strate.
We group the State's contentions Nos. 3, 4, and 6 together for consideration, and find that in the Partin incident and in the Sheridan incident O'Hara did those things which the State contends he did: that is, he did attempt to obtain evidence of wiretapping to aid and assist a convicted felon in a court proceeding, and his office as judge of the Criminal District Court for the Parish of Orleans was an influence in this effort. The State also alleges a conspiracy to obtain testimony to set aside Hoffa's and Strate's convictions. We see no need to pass upon a technical question of conspiracy, but do find that O'Hara clearly acted in concert with Gill and Strate to obtain information for the purpose of overturning a criminal conviction.
Finally, it is the State's contention that the defendant accepted gifts and gratuities from a known convicted felon. This is admitted by the defendant O'Hara.
In summation, a fair conclusion to be reached from the facts presented by the record in this case is that Malcolm V. O'Hara associated with Strate knowing that he had been convicted in a federal district court of a felony; that he used his title of judge and the prestige of his office in an attempt to obtain evidence in order to set aside a conviction in a federal court, and that he accepted gifts and gratuities from Strate.
Louisiana judges are elected, and therefore they stand to be removed by the people at the end of their terms. In an effort to balance the people's right to control the election of certain officials, including judges, with the need to protect the people and the judiciary from judges who may be incompetent or corrupt or oppressive or guilty of gross misconduct, the Constitution provides methods of removal of judges in the interims between elections. The grounds for removal are therefore carefully stated and limited since the removal would be accomplished without the approval of the electorate.
If O'Hara is to be removed in this proceeding from his office as criminal district judge for the Parish of Orleans, this court must find that the proven actions and *648 conduct of O'Hara constitute "gross misconduct".
"Misconduct", in general, is improper conduct or wrong behavior, but as used in speech and in law it implies that the conduct complained of was willed and intentional. It is more than that conduct which comes about by reason of error of judgment or lack of diligence. It involves intentional wrongdoing or total lack of concern for one's conduct. Whether or not an act constitutes misconduct must be determined from the facts surrounding the act, the nature of the act, and the intention of the actor. "Gross" is generally defined as "flagrant" and "extreme".
In re Bostwick (1931), 43 Ohio App. 76, 181 N.E. 905, 906, states:
"* * * that gross immorality must be determined according to the common understanding of the ordinary, law-abiding, and reasonable citizens of the country; that the term implies a willful, flagrant, or shameful course of conduct, showing a moral indifference to the opinions of the good and respectable members of the community and to the just obligations of the position held by the delinquent. Moore v. Strickling, 46 W. Va. 515, 33 S.E. 274, 50 L.R.A. 279."
Stanley v. Jones, 201 La. 549, 9 So.2d 678, is the only Louisiana case involving removal of a judge for gross misconduct not connected with his office.
"* * * The record discloses beyond question, we think, that the defendant has been guilty not only of official misconduct but of gross misconduct not connected with his officesuch misconduct, indeed, as makes it necessary that he be removed from office.
"The record shows that he has been guilty of acts involving moral delinquency, want of integrity, and moral turpitude; acts in violation of duties, acts evil and wrongful; acts which are contrary to justice and common honesty, which are contrary to sound principles and good morals; acts which reflect such serious defects in his character as to render him utterly unfit to perform the delicate and important functions of the office which he holds.
"The office of judge is one in which the general public has a deep and vital interest, and, because that is true, the official conduct of judges, as well as their private conduct, is closely observed. When a judge, either in his official capacity or as a private citizen, is guilty of such conduct as to cause others to question his character and morals, the people not only lose respect for him as a man but lose respect for the court over which he presides as well.
"The testimony shows beyond question that the defendant was guilty of reprehensible and censurable conduct * *."
The reprehensible conduct of which the court spoke in Stanley v. Jones, supra, consisted of letters of threat, coercion, and blackmail; false swearing; the issuance of worthless checks; the illegal and wrongful collection of court reporter fees; the use of threat and coercion upon lawyers who practiced before the court.
We have no difficulty in charging the defendant O'Hara with misconduct. His conduct does not comply with the standards set forth in the Canons of Judicial Ethics. Although the Canons of Judicial Ethics have great importance and meaning to members of the judiciary in setting the standard of conduct expected of members of the judiciary, they do not replace or modify the Constitution and the grounds for removal there stated. If disregard of the Canons of Ethics or of any other standard of conduct is such as to constitute gross misconduct, then and then only is an elected official subject to removal from office.
"The grounds enumerated in the constitution or statute for which a judge may be removed from office are subject *649 to strict construction, since they are quasi-penal, and there can be no removal except on the grounds therein enumerated. * * *" 48 C.J.S. Judges § 27b, p. 975; see McCully v. State, 102 Tenn. 509, 53 S.W. 134, 46 L.R.A. 567; McMillen v. Diehl, 128 Ohio St. 212, 190 N.E. 567; State ex rel. Jones v. Tugwell, 199 La. 12, 5 So.2d 368.
It is helpful to our decision to restate some of the particular language in Stanley v. Jones, supra. According to that decision, a judge is subject to removal when he is guilty of "* * * such misconduct, indeed, as makes it necessary that he be removed from office * * *"; "* * * acts which reflect such serious defects in his character as to render him utterly unfit to perform the delicate and important functions of the office which he holds"; "* * * such conduct as to cause others to question his character and morals, [and] the people not only lose respect for him as a man but lose respect for the court over which he presides as well".
While we as individual members of the judiciary find O'Hara's conduct unacceptable in his relationship with and efforts in behalf of Strate, we cannot as a court of law, acting under the clear language and intent of the Constitution, substitute this personal judgment for the electorate's judgment. Although the defendant is guilty of misconduct, we do not find him guilty of that flagrant and extreme misconduct which would warrant his removal under the constitutional provisions. He has compromised his office and the high degree of trust placed in him by the electorate, but the record does not reflect that this conduct has rendered him "utterly unfit" to perform the functions of his office. The record reflects, to the contrary, that during the two years while he was pursuing the course of conduct complained of, O'Hara's discharge of his official duties was not encumbered. O'Hara's conduct does not meet the constitutional requirement for removal for "gross misconduct".
Finally, we would like to dispel the shadow, the innuendo, the implications cast over these proceedings that the actions and conduct of this one man placed the entire judiciary upon trial. Every endeavor is to be judged out of the whole cloth and not out of the minute pieces, and certainly this unfortunate piece is not to be a reflection of the moral fiber, character, and standards of the entire judiciary. To the contrary, we are inclined to believe that the vast majority of the judiciary adhere to all of the Canons of Ethics and to the highest standard of conduct expected of man.
For all the reasons assigned the suit is dismissed.
McCALEB, Justice (dissenting).
On the facts found by the majority, I am unable to subscribe to the view that Judge O'Hara was not guilty of "gross misconduct" within the meaning of the Constitution and as the term is further defined and explained by this Court in Stanley v. Jones, 201 La. 549, 9 So.2d 678. O'Hara's conduct assuredly cannot be characterized as a series of personal indiscretions of a private sort disassociated with his judicial office, nor can his acts be viewed simply as thoughtless improprieties violative only of the Canons of Judicial Ethics. Indeed, the Court itself finds his misconduct to be of a more reprehensible nature.
In speaking of the document which O'Hara endeavored to have Partin sign, the majority opinion observes:
"The testimony never reveals the exact nature of this document. We find it immaterial, however, whether the instrument was prepared as an affidavit or merely as the basis for obtaining oral statements from Partin. We do make the finding that O'Hara was fully aware of *650 the contents of the instrument and of all the circumstances surrounding and the reasons for the meeting with Partin. We find as a fact that O'Hara went to Baton Rouge to get information from Partin to overturn the conviction of Strate. We find that he also knew that his position as judge might be helpful in obtaining the information." (Emphasis mine.)
And following a complete review of the evidence, the opinion further states:
"In summation, a fair conclusion to be reached from the facts presented by the record in this case is that Malcolm V. O'Hara associated with Strate knowing that he had been convicted in a federal district court of a felony; that he used his title of judge and the prestige of his office in an attempt to obtain evidence in order to set aside a conviction in a federal court, and that he accepted gifts and gratuities from Strate." (Emphasis mine.)
Whenever a judge uses the title and prestige of his office "* * * in an attempt to obtain evidence in order to set aside a conviction in a federal court * * *", or in any other court for that matter, and accepts gifts and gratuities from one who would be benefited by the overturning of the conviction, he is guilty of gross misconduct in my estimation. For these acts, to paraphrase from Stanley v. Jones, supra, reflect such serious defects in his character as to render him utterly unfit to perform the delicate and important functions of the office he holds, and constitutes such conduct as to cause others to question his character and morals, and the people to lose respect for him as a man and respect for the court over which he presides as well.
I respectfully dissent.
HAMITER and McCALEB, JJ., are of the opinion that a rehearing should be granted.
NOTES
[1] Article 9, Section 1, Louisiana Constitution of 1921, reads: "All state and district officers, whether elected or appointed, shall be liable to impeachment [removal, see Art. 9, Sec. 5] for high crimes and misdemeanors in office, incompetency, corruption, favoritism, extortion, or oppression in office, or for gross misconduct, or habitual drunkenness." (Emphasis supplied.)
[2] Strate, James R. Hoffa, Benjamin Dranow, S. George Burris, Abe I. Weinblatt, Calvin Kovens, and Samuel Hyman were convicted in the United States District Court for the Northern District of Illinois of mail and wire fraud and conspiracy to defraud the Teamsters' pension fund. Conviction was affirmed in United States v. Hoffa (C.C.A. 7 1966), 367 F.2d 698. The case was remanded by the United States Supreme Court in Hoffa v. United States, 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967).
[3] James R. Hoffa, then president of the Teamsters Union, and three others were convicted of willfully endeavoring to influence, intimidate, and impede petit jurors, in violation of Title 18 U.S.C. § 1503. Affirmed: United States v. Hoffa (C.C.A. 6 1965), 349 F.2d 20; Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). The jury tampering occurred in the trial of Hoffa in what has been referred to as the "Test-Fleet Case", when he was charged with violating the Taft-Hartley Act. Hoffa's acts as president of the Teamsters Union and his many court appearances have been highly publicized, and he is a very controversial figure. The news media have almost uniformly been critical of him and his union. It is implied in this proceeding that if O'Hara's acts were to help the notorious Hoffa, they are more censurable.
[4] Strate's version of the beginning of the attempt to obtain information about wiretapping is given in his testimony as follows:

"* * * I had been to a meeting of a group of our lawyers and all of the defendants in our case, and I had heard that Edward Grady Partin wanted to help, and that he had knowledge of wire tapping in Chattanooga.
"At the meeting, the lawyers said that it would help our case in Chicago if we could get evidence of wire tapping in Chattanooga, because some of the lawyers who represented some of the defendants in Chicago were the same lawyers that had participated in the case in Chattanooga, and, as the cases were practically running concurrently, they were preparing our defense, while they were in Chattanooga, for our cases in Chicago, and they thought that any evidence of wire tapping in the Chattanooga case would automatically overturn our case in Chicago.
"With that in mind, when I came back to New Orleans I talked about if I could only find somebody that was friendly with Partin, and, if he was really willing to help like he had said, maybe he would admit his knowledge of wire tapping in Chicago, and this would help me.
"I mentioned to O'Hara, did he know somebody in Baton Rouge that was familiar with Partin, so that he could talk to him about it."