9 So.2d 678

**STANLEY, Atty. Gen., v. JONES.**

No. 36003.

July 20, 1942.

Rehearing Denied Aug. 5, 1942.

See, also, 197 La. 627, 2 So.2d 45.

Eugene Stanley, Atty. Gen., and James I. McCain, Sp. Asst. Atty. Gen., for plaintiff.

John R. Hunter & Son, of Alexandria, and Cawthorn & Golsan, of Mansfield, for defendant.

ODOM, Justice.

This suit was brought by the Attorney General on October 14, 1940, to remove James W. Jones, Jr., from the office of Judge of the Tenth Judicial District Court for the Parishes of Red River and Natchitoches. The suit was brought as an orig-

inal proceeding in this court under Sections 1 and 5, Article IX of the Constitution of 1921.

Section 1, Article IX of the Constitution, reads as follows:

"All State and district officers, whether elected or appointed, shall be liable to impeachment for high crimes and misdemeanors in office, incompetency, corruption, favoritism, extortion, or oppression in office, or for gross misconduct, or habitual drunkenness."

Section 5 of that article provides that "For any of the causes specified in Section 1 hereof, the judges of the courts of record may be removed by judgment of the Supreme Court", and that "Such suits may be instituted by the Attorney General".

The defendant excepted to the petition filed by the Attorney General on various grounds. Each of the exceptions was overruled by this court in an opinion handed down on April 10, 1941, and a rehearing was refused on April 28. Stanley, Attorney General, v. Jones, 197 La. 627, 2 So.2d 45.

In that opinion will be found a full and complete statement, not only of the charges preferred against the defendant by the Attorney General, but of the issues of law involved. It is not necessary, therefore, to restate in full those issues here.

The Attorney General alleged, and it is shown, that the defendant had been continuously serving as judge of his judicial district since January 1, 1931, and alleged that he was subject to removal for high crimes and misdemeanors in office, incompetency, favoritism, extortion, oppression in office, and gross misconduct. In our former opinion we held that a proceeding by the Attorney General for the removal of a district judge from office could be based on offenses committed by the judge prior to his present term of office. We held also that, under Section 1, Article IX of the Constitution, a district judge may be removed from office not only for "misdemeanors in office" but also for "gross misconduct" not connected with his office; that misdemeanor in office is synonymous with misconduct in office, and that the framers of the Constitution intended that a public officer could be impeached and removed from office not only for official misconduct but for "gross misconduct" not connected with the office, "gross misconduct" and "habitual drunkenness" being specified as additional or further causes for impeachment and removal.

As relates to the causes for which a district judge may be removed from his office, our former opinion is the law of this case. In the former case the defendant, by filing certain exceptions, squarely presented the question whether a district judge may be removed from office for gross misconduct not connected with his office. The exceptions filed by him raising that issue were overruled. The case is now before us on the merits.

Two briefs have been filed in support of defendant's contention that the testimony adduced before the Commissioner, who was appointed by this court to take the testimony, does not support the Attorney General's charges and is not sufficient to

warrant the conclusion that he should be removed. One of the briefs seems to have been written by defendant himself, the other by his attorneys. In these briefs the writers discuss in detail and at great length the testimony found in the record on which the Attorney General relies to support his argument that the defendant should be removed, and discuss also at length and in detail the testimony on which the defendant relies to refute the charges brought against him.

The record of the testimony is contained in four volumes and covers approximately 2,000 pages. There were something like 150 witnesses called and examined before the Commissioner. The testimony of these witnesses relates to the conduct, official and otherwise, of the defendant during a period of some 10 or 12 years. The defendant requested that his testimony be taken before this court instead of before the Commissioner. His request was granted, and he was before this court as a witness for about three days. His testimony is in the record and covers nearly 500 pages.

The charges preferred against the defendant by the Attorney General are set out in his original and supplemental petitions, containing in the aggregate 110 articles. Articles 4-30, inclusive, contain charges that the defendant was paid, and accepted, certain sums of money as bribes to influence him in the conduct and performance of his official duties. We shall not discuss these charges further than to say that in our opinion the testimony as a whole is not sufficient to warrant a holding

that the defendant was guilty of accepting bribes.

The Tenth Judicial District of Louisiana is composed of the Parishes of Natchitoches and Red River. The defendant resided at Natchitoches in the Parish of Natchitoches, and in the performance of his official duties it was necessary for him to make trips from Natchitoches to Coushatta, the parish seat of Red River Parish. Act No. 206 of 1926 provides that those judges of district courts whose districts comprise two or more parishes shall be entitled to be reimbursed their actual travelling and hotel expenses incurred in the discharge of their official duties in the respective parishes of their districts other than the parishes in which they reside. The act provides further that the amount of such expenses shall be payable monthly on their own warrants, "to which shall be attached statements of said expenses, which shall not exceed the sum of six hundred dollars for any judge in any one year".

Articles 31-47, inclusive, relate to charges made by the Attorney General that defendant had rendered false statements of his expenses over a period of years in order to collect the maximum amount allowed for such expenses under the act. In Article 35 it is alleged that in the month of July, 1939, the defendant claimed eight trips to Coushatta at $5 per trip, plus $10 for hotel expenses, whereas during that month he made only three trips to Coushatta on official business and held court there only three days during that month. In Article 36 it is alleged that in the month of August, 1939, the defendant claimed ex-

penses for six trips to Coushatta, whereas he made only one trip during the month and opened court on one day. In Articles 37-47, inclusive, similar allegations were made as to the padding of his expense account during succeeding months up to June, 1940.

To support these charges, the Attorney General offered the testimony of the clerk of court and the sheriff of Red River Parish to show that, as a matter of fact, the defendant did not hold court in the Parish of Red River for the number of days shown on the account rendered by him. The clerk's testimony was based upon his examination of the minutes of the court, which showed the number of days the court was in session.

The defendant was questioned as to these charges and did not dispute the testimony given by the clerk and the sheriff as to the number of days court was held. But he said that he made numerous trips to Coushatta to perform official duties not connected with open court proceedings. He said he was frequently called upon to visit Coushatta by litigants, lawyers, and officials to sign orders in foreclosure proceedings, to fix bonds in criminal cases, to sign various and sundry orders which the law authorized to be signed at chambers, etc. He testified that, as a matter of fact, he had never at any time drawn from the State more than the amount actually due him for expenses.

A bank official of Natchitoches testified that on various occasions the defendant had drawn in advance warrants for $50

each, the maximum amount allowed by law for each month, and had pledged the warrants to the bank to secure loans. He testified further that such warrants had been drawn and pledged for as much as a year in advance. The defendant admits this. Of course, when the warrants were thus drawn and pledged, the defendant could not know that his expense during any future month would amount to as much as $50. Defendant testified that there were times when his expenses during a given month did not amount to $50, and that at such times he made up the difference to the bank, and that finally he was paid by the State only such expenses as he had actually incurred.

The Attorney General did not prove definitely that the defendant did not make more official visits to Red River Parish than were reflected by the minutes of the court, nor did the defendant show definitely that his expenses amounted to as much as he had actually drawn. The burden of proving the charges rested upon the Attorney General. We cannot say that these particular charges are supported by sufficient proof to sustain a holding that the defendant was guilty of official misconduct in this respect.

Articles 48-53, inclusive, charge misconduct on the part of the defendant with reference to the empanelling of a grand jury and the entering of an order discharging the grand jury. We shall not discuss these charges for the reason that, in our opinion, the allegations of misconduct in this respect are not supported by the record.

Articles 54-58, inclusive, relate to charges that the defendant was guilty of official misconduct in the course of certain judicial proceedings begun before him in connection with the primary election held in 1936 for the nomination of a judge of the Tenth Judicial District, at which election the defendant was himself a candidate for reelection. It is alleged that the unofficial returns showed that defendant's opponent was nominated by a majority of 165 votes, and that defendant induced a number of his friends to file an injunction suit against the Judicial Executive Committee to restrain the committee from promulgating the returns of that election; that the injunction suit was brought in the court over which the defendant was presiding; that defendant was the primary party at interest in the injunction suit, and that the defendant himself, as presiding judge, without recusing himself as required by law, signed a temporary restraining order restraining the committee from promulgating the results of the primary election; that in connection with said suit the defendant signed an order directing the sheriff to seize and sequester all election paraphernalia and papers in the possession of the committee and to hold them until further orders of the court; that defendant's judicial acts in signing these orders were illegal, to the knowledge of the defendant, and that the defendant issued the orders in an effort to use his judicial office to secure a personal advantage over his opponent at the said primary election.

We have carefully considered all the testimony, as well as the court records, offered in support of these charges. Our conclusion is that the testimony adduced does not conclusively show that the defendant was guilty of any intentional wrong in connection with these proceedings.

While for lack of proof we acquit the defendant in so far as the above mentioned charges are concerned, yet there are other legal causes for removal set out by the Attorney General which are amply supported by the record. The record discloses beyond question, we think, that the defendant has been guilty not only of official misconduct but of gross misconduct not connected with his office—such misconduct, indeed, as makes it necessary that he be removed from office.

The record shows that he has been guilty of acts involving moral delinquency, want of integrity, and moral turpitude; acts in violation of duties, acts evil and wrongful; acts which are contrary to justice and common honesty, which are contrary to sound principles and good morals; acts which reflect such serious defects in his character as to render him utterly unfit to perform the delicate and important functions of the office which he holds.

The office of judge is one in which the general public has a deep and vital interest, and, because that is true, the official conduct of judges, as well as their private conduct, is closely observed. When a judge, either in his official capacity or as a private citizen, is guilty of such conduct as to cause others to question his character and morals, the people not only lose respect

for him as a man but lose respect for the court over which he presides as well.

The testimony shows beyond question that the defendant was guilty of reprehensible and censurable conduct especially in connection with the writing of a certain letter discussed in the briefs as the "Cooley Letter"; in connection with the case of Shreveport Long Leaf Lumber Company v. Jones; in connection with the "Rex Scott Case"; in connection with the "Wroten Court Reporter Case"; in connection with the drawing of worthless checks, and in writing the so-called "Hunter Letter".

## The Cooley Letter

There was filed in evidence and brought up in the record the following letter alleged to have been written by the defendant:

"Febarury 2nd, 1936.
"Mr.John Cooley,
· "Goram, La.,

"Dear sir:

"I understand that you have truned and are now supporting my opponent in the second primary for the judgship and that you also supported him in the forst primary,after telling me that you were my supporter. I also understand that you are actively urging people to vote for my opponent.

"This is quite in contrast with your and your wifes pleas for me to be lenient on your son,Rufus, when I could have sent him to the penitentuary and disgraced your family. You was very brkne hearted then. But,now when my plea comes you turn against me. You recall that I also hold

a mortgage on your home and you have not as much as paid the interest for the past two years,and I have never urged that you pay,because I thought that you could not pay. I could have had your home sold, and now when I need help you turn for those who are trying to destry me. I Juest wonder what you have to say? I also recall that your boy is to come up again on the convening of court. I have done more for your family than for any other family in Ward Eight. I shall watch your activaties.

"Yours very truly,
"Jas.W.Jones,Jr."

Counsel for defendant say in their brief that the charge imputed in this letter is "ultra petitionem". But they did not object to the introduction of the letter in evidence on that ground. The testimony recorded in Volume I, page 220, shows that the objection urged was as follows:

"I object to the reading of that letter into the record for the reason and on the ground the letter has not been proven to have been written by Judge Jones. In other words, the proper foundation for the introduction of that letter has not been laid."

The fact that this letter was not specifically mentioned by the Attorney General in his petition affords no reason why it should not be considered, since the only objection urged to its introduction was that it had not been shown that defendant wrote it. The settled rule of practice is "that evidence received without objection has the effect of enlarging the pleadings and will be considered as if for-

mal plea had been made". Ducote v. Ducote, 183 La. 886, 165 So. 133. In Phillips v. New Amsterdam Casualty Co., 193 La. 314, 190 So. 565, 567, this court said:

"This court, in an unbroken line of jurisprudence, has laid down the principle to the effect that evidence otherwise inadmissible received without objection enlarges the pleadings and must be considered by the court." (Citing a long list of cases.)

The writing of this letter and the implications of misconduct revealed by it were considered throughout as one of the major points involved in the case. No objection was urged to the introduction of testimony to prove that the defendant wrote the letter. The defendant himself, without objection, testified at length concerning it.

Mr. Cawthorn, counsel for defendant, handed him a photostatic copy of the letter and asked him whether he "wrote this letter or if it was written with your knowledge or consent or under your direction or supervision, or if you had anything at all to do with the writing of the letter". Defendant's answer was:

"I did not write the letter and I did not know the letter had been written until it was presented to me in court at Shreveport in the presence of Judge Palmer, Commissioner. I had nothing whatever to do with the writing of the letter." (Page 1733)

The defendant later said:

"May I add, Your Honors, that I was told since this suit began who wrote the letter?" (Page 1734)

One of the justices then asked defendant whether he had merely heard that a certain party had written the letter or whether the party told him he wrote it, and the witness replied:

"No, he told me personally, after Mr. McCain produced that letter in court. I had never heard of it or seen it. I began investigating who wrote it. It was written on my typewriter and somebody told me they wrote it. In other words, they told me they wrote it themselves."

■■ The burden of proving that defendant wrote the letter rested upon the Attorney General. We think he discharged that burden.

The letter was not signed by the defendant in his own handwriting, but the signature "Jas. W. Jones, Jr." was typewritten. Therefore, the question was whether defendant had written the letter. Notwithstanding the fact that the defendant emphatically denied that he wrote the letter, the testimony shows beyond question that he did write it. The defendant testified positively that he did not write the letter, but that he knew who did write it. He said that the party who wrote it told him so. But he did not divulge the name of the party who, he said, wrote the letter, nor did he call the party as a witness although he had ample opportunity to do so. The testimony of the defendant was taken before this court in New Orleans, and two weeks later he gave additional testimony. The defendant could have exculpated himself from the charge that he had written the letter by calling as a witness the party who, according to his statement, had ad-

mitted that he wrote it. But defendant neither named the party nor called him as a witness.

. In Crescent City Ice Co. v. Ermann, 36 La.Ann. 841, this court said:

"The presumption is always and inevitably against a litigant who fails to furnish evidence within his reach."

In Jones on Evidence, Volume I, Section 17, page 49, it is said:

"There is a recognized legal presumption that a party will produce evidence which is favorable to him if such evidence exists and is available."

The ruling in the following cases is in point: Bastrop State Bank v. Levy, 106 La. 586, 31 So. 164; School Board v. Trimble, 33 La.Ann. 1073; Nunez v. Bayhi, 52 La.Ann. 1719, 28 So. 349; Pruyn v. Young, 51 La.Ann. 320, 25 So. 125.

 Defendant did not say that the party who said he wrote the letter was not available as a witness. Defendant was represented by able counsel, who were, of course, familiar with the general rules above stated, and it must be assumed that, if the testimony of defendant that a certain individual acknowledged the writing of the letter was true, an effort would have been made to produce the party as a witness or to show that the party was not available. We therefore give no credence whatever to defendant's statement on this point.

The defendant admitted that the letter was written on his typewriter. At the hearing before the Commissioner prior to

the date on which the defendant testified, in this court, the Attorney General called two typewriter experts who had before them another letter admittedly written by the defendant himself on his typewriter, the other letter (called the "Hunter Letter") bearing the genuine signature of the defendant. After comparing the Cooley Letter with the Hunter Letter, these experts testified not only that the two letters were written on the same typewriter but that they were written by the same person. To show that these letters were written by the same person, the experts pointed out certain unusual characteristics common to both letters, which were (1) the use of the capital "I" for the figure "one" instead of the small "1" which is commonly used, and (2) the failure to space after commas. Photostatic copies of these letters were filed in evidence and are before us. We note first the two unusual common characteristics pointed out by the experts, as described above. In addition, we note certain other characteristics of style and peculiarities of typing common to both letters, as follows:

(1) The typewritten signature in each—the Hunter Letter contains a typewritten signature as well as a genuine signature—is written without any spacing whatsoever, and as to punctuation and abbreviation the two are identical, viz.: "Jas.W.Jones,Jr."

(2) There is no spacing after a period which follows the abbreviation "Mr." or which follows an initial:

"Mr.John Cooley" (Cooley Letter)
"Mr.John R.Hunter" (Hunter Letter)
"Jas.W.Jones,Jr." (Both letters)

(3) The ordinal numbers "2nd" and "10th" in the dates in the Cooley and Hunter letters, respectively, are used instead of the cardinals "2" and "10".

(4) In each letter the date is followed by a period and each line of the salutation by a comma, both of which practices are not so common now as formerly.

(5) In the salutation "Dear sir" in the Cooley Letter and "Dear sirs" in the Hunter Letter, the words "sir" and "sirs" are written incorrectly with a small "s" instead of correctly with a capital "S".

(6) In both letters there are frequent "strike-overs", which would indicate that an unskilled operator had typed both letters.

The defendant while on the stand was asked whether he used a typewriter, and he said, "Yes, sir; very poorly though". (Page 1735)

As further evidence showing conclusively, we think, that defendant wrote the Cooley Letter, we note, among others, three misspelled words in that letter. In the letter the word "Gorum", the name of John Cooley's postoffice, is spelled "Goram". The word "judgeship" is spelled "judgship", and the word "penitentiary" is spelled "penitentuary".

When the defendant was on the witness stand before this court, counsel for the State handed him a blank sheet of paper and a pen, and asked him to write the words "Gorum", "judgeship", and "penitentiary". He did so, and spelled the words "Gorum", "judgeship", and "penitentiary" exactly as they were spelled in the Cooley Letter. It would therefore appear that these words were not misspelled in the Cooley Letter through accident or typographical error.

As further evidence that defendant wrote the Cooley Letter, that letter reads in part:

"You recall that I also hold a mortgage on your home and you have not as much as paid the interest for the past two years,and I have never urged that you pay,because I thought that you could not pay."

The record shows that the Cooley note was made payable to any "future holder". The mortgage which was inscribed in the mortgage records so described the note. The defendant, though he owned the note, was not the named mortgagee, his name nowhere appearing in the mortgage or the public records. There was therefore nothing to show or indicate who was the holder or owner of the note. That was peculiarly within the knowledge of the defendant and the maker of the note. Furthermore, it was stated in the letter that the interest on the note had not been paid for two years, which was true. This, too, was peculiarly within the knowledge of the defendant and the maker of the note, and not within the knowledge of third persons.

Counsel for defendant discuss this Cooley Letter in their brief and say that "The record shows that the letter was written by a person other than Judge Jones, out of his presence and without his knowledge or consent". They do not discuss the circumstances which we have detailed above.

The testimony shows conclusively, we think, that defendant wrote the letter. The letter was deposited in the mails and received by John Cooley.

The letter was written while defendant was judge of the district court and during his campaign to succeed himself. The letter calls attention to the fact that the Cooleys had pleaded with defendant to be lenient toward their son Rufus when Rufus was before the court on a criminal charge. The letter shows beyond question that the purpose of it was to coerce the Cooleys into voting for him. The reprehensible feature of the letter is the following:

"I also recall that your boy is to come up again on the convening of court. * * * I shall watch your activaties."

A reading of this letter clearly discloses its meaning. No one can read it without knowing precisely what it meant. Defendant, in effect, called attention to the power which was vested in him as judge in dealing with persons brought before the court under criminal charges. It called the Cooleys' attention to the fact that their son had been before him on a former case, at which time the judge showed leniency when he might have disgraced the family by sending the boy to the penitentiary. It called their attention to the further fact that the same son would soon come before him on another criminal charge. The implication there is that it was within his power to deal harshly or leniently with the son as he saw fit, and he said to them, "I shall watch your activaties", which meant, of course, that, if the Cooleys changed and supported him, he might be lenient with their son as he had been on the former occasion; that, if they did not change and support him, he might use the power vested in him as judge to punish their son severely, but, if

they did change and support him, he might use that same power to favor their son.

More flagrant misconduct and oppression in office than this can hardly be imagined. In order to gain the political support of the Cooleys, he held over their heads the threat that he might use the power vested in him to punish them in case they refused to comply with his wishes. Even though the letter in terms did not contain a direct threat, yet its meaning could not be misunderstood.

Shreveport Long Leaf Lumber
Company Case

On December 22, 1932, the defendant executed his promissory note for the sum of $2,184.32, made payable to the order of "Shreveport Long Leaf Lumber Company, Incorporated". The note was payable in installments of $100 per month, including interest, the payments to begin on January 31, 1933. The consideration for the note was the balance of the purchase price of building material purchased by the defendant at the Natchitoches Lumber Yard, which seems to have been owned and operated by the Shreveport Long Leaf Lumber Company, which company had its domicile in Shreveport. The note was not paid, and suit was filed to collect it on February 8, 1935. On October 18, 1935, defendant accepted service and waived citation. In February, 1936, the plaintiff filed a petition in which it alleged that the original record in the case had been lost or destroyed, and requested that a voluntary nonsuit be entered without prejudice. Plaintiff then filed another suit. The defendant filed answer to the second suit on November 20, 1936, in which he specifically alleged that he was

not indebted unto the plaintiff in any sum whatever, although he admitted that the note sued on was signed by him. Paragraph 8 of his answer reads as follows:

"Further answering, respondent shows that he at no time owed the Shreveport Long Leaf Lumber Co. any amount and that the said note herein declared upon, while it was signed by defendant, was made and executed through error and without any consideration whatsoever, and respondent specially pleads failure of consideration, or lack of consideration in said note, and shows that same should be declared illegal, uncollectable and having been executed without any consideration should be returned to the maker, your respondent."

The answer was signed by his attorney, Gibbs, and was verified by defendant's personal affidavit made before a deputy clerk of court. The affidavit reads as follows:

"Before me, the undersigned authority, personally came and appeared James W. Jones Jr., defendant herein, who being by me first duly sworn, deposes and says that all of the allegations contained in the above and foregoing answer are true and correct.
"Jas. W. Jones Jr.

"Sworn to and subscribed before me on this the 20th day of November, 1936.
"A. H. O'Quin
"Dy Clerk."

When the case was called for trial, defendant did not take the stand, and offered no testimony whatever. There was judgment for plaintiff, and defendant appealed to this court suspensively and devolutively, and the judgment was affirmed. Shreve-

port Long Leaf Lbr. Co. v. Jones, 188 La. 519, 177 So. 593.

In order to perfect his suspensive appeal, the defendant executed bond in the sum of $4,782, with John Williamson as surety on the bond. Written on the reverse side of the appeal bond is an affidavit made by John Williamson which reads as follows:

"John Williamson first duly sworn deposes and says that he is worth more than the sum mentioned in the bond on the reverse side hereof, in property above his just debts exemptions and liabilities in Natchitoches Parish, Louisiana."

The affidavit was signed before a deputy clerk of court. Also on the reverse side of this suspensive appeal bond is an affidavit made by the defendant Jones, reading as follows:

"———— Being first duly sworn deposes and says that John Williamson surety on the bond on the reverse side hereof is worth more than the sum mentioned in this bond, in property above his just debts, exemptions, and liabilities in the Parish of Natchitoches, State of Louisiana.

(Signed) "Jas. W. Jones

"Sworn to and subscribed before me this the 13th day of Febry, 1937
"E. S. Prudhomme
"Deputy Clerk Tenth D. C. La."

The Attorney General alleged and argues that the defendant Jones, who was then judge, exercised his powers as such to delay the collection of this note. We shall not discuss this point here, but the record in that suit and that in the present case show

beyond question that the defendant in his private capacity as litigant was guilty of the grossest kind of misconduct in connection with this suit from the beginning to the end. Counsel for defendant, in discussing this case in their brief, say that Judge Jones' conduct in these proceedings was as an individual and not as judge, "and hence the normal and usual feelings and actions must be recognized". They then say that "The note was owed and was due and the judgment is now executory". They say that Judge Jones admits this. Further on in their brief they say that "Judge Jones carefully avoided denying the obligation of the note itself. Though counsel discounts the statement, the record discloses that he was never informed of the fact that this vendor was a subsidiary of the plaintiff until during the pendency of the suit. The defense was stiff and bitter, but presented nothing illegal or morally wrong".

As to whether Judge Jones acted in good faith in making the defense which he did in that case and as to whether he was informed of the fact that plaintiff was the holder and owner of the note sued on and that he was debtor to the plaintiff, the record speaks for itself. It is now admitted that Judge Jones owed the note sued on. Defendant admitted before this court that the consideration for the note was the balance due for building material. But in his answer to the suit he denied that he owed plaintiff anything, and alleged that the note was given without consideration.

The defendant testified before this court that he purchased the building material from the Natchitoches Lumber Yard and that, at the time the purchase was made and at the time the note was given, he did not know that the Natchitoches Lumber Yard was owned by the Shreveport Long Leaf Lumber Company, to which latter concern the note was made payable. He said that he had notice that the note was not payable to the Natchitoches Lumber Yard. He said further (p. 1470), "Well, when they filed suit they didn't attach the note to the suit and I taken the position and my defense was for want of consideration. After I found out in the suit that the Shreveport Long Leaf Lumber Company was the plaintiff on the debt I owed to the Natchitoches Lumber Yard, why then my defense was that it was for want of consideration. The plaintiff put its witness, Mr. Pittman, on and proved the Natchitoches Lumber Yard was owned and controlled and it was a subsidiary of the Shreveport Long Leaf Lumber Company. After they did that I refused to take the stand. I could not afford to swear falsely. Then, I have abandoned the defense."

When the defendant testified that he did not know until the day on which the suit was tried that the Shreveport Long Leaf Lumber Company owned the note sued on and that he was a debtor to that concern, he clearly contradicted the testimony which he had previously given at page 1469 of the record, where he said that he was not able to pay the note when it fell due and that "the note rocked on", and that he went to Mr. Pittman "who was the manager of the Shreveport Long Leaf Lumber Company and told him I was in the race for district judge; that I was not able, financially, to make payment of the note and asked him to

extend it". He said that later on Mr. Hunter, counsel for the plaintiff lumber company, wrote him about the note. He said: "I went to Shreveport to see Mr. Hunter and then they filed suit on it. I went back to Shreveport to see Mr. Short and we sent for Mr. Pitman. Mr. Pitman came over to Mr. Hunter's office. I asked him to give me further time on it. They refused to give it to me. They told me that they were going to sue me." He said he told them that, if they sued him, he would have to fight it, and told them further that, "if I can beat you, if you are just determined to publish me here in the campaign in the suit, why if I have to fight it I am going to fight it and if I can beat it I am going to beat it".

Clearly, therefore, he knew before the suit was filed that the Shreveport Long Leaf Lumber Company was his creditor, although he stated a few moments later that he did not find out that it was his creditor until the day on which the suit was tried.

Furthermore, there is filed in this record a letter admittedly written by the defendant, dated March 25, 1935, addressed to Hunter & Hunter, attorneys for the Shreveport Long Leaf Lumber Company, which reads as follows:

"Did not get to write you on Saturday as promised on account being in Court all day.

"I understand that you wish me to advise what period of extension I wish to pay the note given for building material sold me by the Natchitoches Lumber Yard and on what terms of settlement.

"I feel that I can pay the ammount as follows—50% in September and 50% in October 1935, and accordingly I understand that you agree to let the suit filed remain as it is now, without further action or prosecution of the suit untill that date.

"Please advise me as to whether this will be acceptable.

"Yours very truly.
"Jas. W. Jones Jr
"Jas. W. Jones Jr."

After writing this letter stating the extension of time which he wished and stating when he could pay the note, he filed an answer on November 20, 1936, approximately one year and six months later, in which he specifically denied that he owed plaintiff anything, and alleged that said note should be declared illegal and "uncollectable and having been executed without any consideration should be returned to the maker, your respondent".

It is therefore perfectly evident that defendant knew, when he filed his answer to the suit, that he owed the amount demanded in plaintiff's suit and that he owed the amount to the plaintiff and not to the Natchitoches Lumber Yard, and he knew, of course, that the note was not given without consideration. He says that, when he found that out, he did not take the stand and deny that he owed the amount to plaintiff because he could not afford to swear falsely. And yet he personally verified the answer to the suit and made oath that he owed the plaintiff nothing and that the note was given without consideration. He testified in this case that, when he found out during the trial of the suit that he owed

the amount to the plaintiff, he abandoned his defense. And yet the record shows that, notwithstanding the fact that he offered no defense at the trial, he appealed the case to this court on February 13, 1937, and the case was not decided by this court until November 2, 1937. He applied for a rehearing, which was denied on November 29, 1937.

The defendant testified under oath before this court that the consideration for the note was the balance due for building material. He therefore knew all along that the note was not given without consideration, as he alleged in his answer. His testimony indicates that the reason he pleaded that the note was given without consideration was that he thought he owed the Natchitoches Lumber Yard and not the Shreveport Long Leaf Lumber Company, to which latter concern the note was made payable. But the facts are that he did know, nearly two years before he filed his answer, that he was indebted to the Shreveport Long Leaf Lumber Company. He testified before this court that he made at least two trips to Shreveport, where he interviewed officials of the Shreveport company, asking for further time in which to pay the note. His own testimony, as well as the record, shows that the holder of the note granted an extension of time which was satisfactory to him. A letter, admittedly written by defendant to attorneys for the Shreveport company, stating that he would be able to pay the note later on, is in the record, and we have quoted it above. His answer to the suit was filed approximately 18 months after his visit to Shreveport and after he wrote the letter to the attorneys stating that the extension of time was satisfactory to him and stating that the amount due on the note would be paid on certain dates mentioned by him.

It is therefore perfectly clear that he deliberately swore falsely when he made his affidavit verifying the allegations of his answer. It is inconceivable that a man who has the slightest respect for his solemn oath and who is disposed to deal fairly and honorably with his creditors would stoop to such tactics as defendant practiced in this case to harass and ultimately defeat them.

In order to perfect his suspensive appeal bond, defendant executed bond in the sum of $4,782, with John Williamson as surety.

The testimony shows that, when this bond was signed, Williamson, the surety, owned no property at all except two horses and four cows, worth, according to Williamson's testimony, about $350, although the defendant made affidavit that Williamson owned property having a value in excess of the amount of the bond and legal exemptions. Williamson at that time lived in the City of Natchitoches, where the defendant lived, having moved there in 1936. At the time the bond was signed, Williamson was doing odd jobs such as he could get, and had no other income. About that time or shortly thereafter, he engaged in the business of collecting and removing garbage from the streets, in which business he was engaged when this removal suit was filed. He now owns two old trucks and some other personal property worth altogether less than $1,000.

The defendant testified before this court that he made the affidavit attached to the suspensive appeal bond in good faith. His testimony, however, taken as a whole, does not bear out his statement. He said that he had known Williamson for many years and that Williamson was at one time a prosperous farmer who owned a tract of land and livestock and who produced each year more than 100 bales of cotton. To support his testimony, the defendant filed in evidence a deed showing that Williamson had acquired 80 acres of land in Natchitoches Parish in 1922. That was a credit deed, and Williamson testified, and the record shows, that the property was sold at foreclosure sale in 1927, and that never thereafter did Williamson own any real property in Natchitoches Parish or elsewhere. Williamson testified that he "went broke" in 1927 and had been "broke" ever since. The defendant testified that he did not know this. He said that he learned in 1938, about one year after this bond was given, that Williamson was bankrupt, and that he so held in a suit before his court in which Williamson had signed a bond for $300. In his testimony before this court the defendant said:

"At the time he signed my bond he *probably* was. worth as much as he ever was but when we had these Red River overflows he lost his crops and everything and became insolvent, and the evidence produced the fact that he was insolvent and I had to hold it, regardless." (Page 1390) (Italics ours.)

He would therefore have us believe that Williamson became insolvent between the date on which the bond was signed, which was in 1937, and the date on which the other suit was tried before him a year later, and that he lost his property because of Red River overflows. This was reckless swearing, because it was conclusively shown that Williamson lost his property in 1927, 10 years before the bond was signed.

The defendant admits that he made no investigation to ascertain whether Williamson was solvent at the time the bond was signed. One of the justices asked the defendant this question: "Judge, when you signed that bond, did you ask him if he still owned the property?" The witness answered, "No, sir." By the justice: "You just took it for granted?" The witness: "Yes, he was still there on the property. I didn't know that he didn't own it." (Page 1488) But Williamson was not "still there on the property". When defendant stated that Williamson was "still there on the property", he was under oath, and it was his duty to make no statement which he did not know personally to be true. Defendant was asked the direct question whether he knew Williamson owned the land when he made his affidavit. He answered, "Well, yes, in a sense I knew it and in a sense I didn't." (Page 1487) It is perfectly evident from defendant's own testimony that, at the time the suspensive appeal bond was executed, he did not have information as to Williamson's net worth sufficient to justify his making solemn oath that Williamson was worth more than the amount of the bond.

The record shows that the plaintiff in that suit did not challenge the solvency

of the surety on the bond. But that is not pertinent to the issue here involved. The question involved is whether the defendant was guilty of gross misconduct in swearing that his surety was entirely solvent when it is evident that he did not know this to be so. We think that this was gross misconduct.

## Rex Scott Case

Rex Scott sued James W. Jones to collect the balance due him on an open account for oil and gasoline alleged to have been sold to defendant prior to October, 1932. The case was carried to the Court of Appeal, Second Circuit, where judgment was rendered for Scott in the sum of $194.18. Scott v. Jones, 155 So. 491. The defendant did not pay the judgment. In February, 1935, Scott had Jones' automobile seized under a writ of fieri facias. After seizing the car, the ·sheriff delivered it back to Jones as keeper, and Jones signed a receipt for it as custodian or keeper. Jones was then judge.

On March 19, 1935, Jones filed suit in his court to restrain the sheriff from selling the car. Jones, judge, granted to himself as plaintiff in the suit a temporary restraining order prohibiting the sale of the car until further orders of the court, and fixed the amount of the bond at $100. In his petition Jones described the automobile seized as one four-door Chevrolet sedan, Serial No. 3DA05, Motor No. 4276619. In his petition to enjoin the sale of the car, he alleged, among other reasons why the seizure should be dissolved, that the automobile was exempt from seizure and sale for his debt because it was "an instrument and/or vehicle and/or machine used in his trade and profession (that of Judge of the Tenth District Court, composed of the Parishes of Red River and Natchitoches), and is necessary thereto in going to and from the designated points of your petitioner's courts". Jones' demand to prohibit the sale of his automobile under the writ of fi. fa. was rejected by Judge Hill, who was called in to try the case, and this judgment was affirmed by the Court of Appeal, Second Circuit, on April 3, 1936. Jones v. Scott, 167 So. 117.

After the judgment of the Court of Appeal became final on April 30, 1936, Rex Scott was unable to have his writ of fieri facias executed and unable to have the seized car sold because the car had disappeared. Rex Scott testified in the present case that "The car had disappeared and he [Jones] was driving a new one". Scott further testified that he looked diligently for months for the seized automobile but was unable to find it, and that the car was never found although he made diligent search for it. The reason he could not find the car was that, as a matter of fact, the seized car was sold or traded in to the Howard Crumley Motor Company in Shreveport on June 10, 1936, by Mrs. Ernestine Cook, the daughter of Judge Jones, and on the following day the Howard Crumley Motor Company sold it to a third party who shipped it to California. A deputy sheriff testified in this case that the seizure of the car had never been released. Therefore, the car was sold while under seizure and in the custody and keeping of Jones, who had signed a receipt for it after it was seized by the sheriff.

After Rex Scott testified before the Commissioner in this case that the seized car could not be found in Natchitoches, the defendant testified before this court that, as a matter of fact, the car was in and around Natchitoches until 1939, and could have been found and sold at any time the seizing creditor saw fit. One of the justices asked the defendant whether the seized car was in the possession of himself or his daughter, and he said:

"No, sir, I will state that he [Scott] claims I had a new automobile. We paid cash straight out for the automobile [the new automobile] and have the check where I paid the cash. In other words, it was not traded in. We drove the car until it was worn out." (Page 1440)

The testimony shows that, as a matter of fact, the defendant did have a new car, as Scott testified. Defendant said that the new car was purchased for him by his company and paid for by a check of the company, which check was offered in evidence. The check is dated November 14, 1936, made payable to Howard Crumley & Co., for $909.59, signed by the Central Security & Title Company by J. D. Smith, secretary-treasurer, and endorsed by Howard Crumley. Defendant testified that the old car (the car which was seized) was not traded in as a part of the consideration for the new car. One of the justices asked defendant: "What happened to the old car?" The witness replied: "My daughter was driving it, using it." (Page 1444) Defendant was then asked: "What became of it?" He replied: "She traded it in in Monroe for a car. It was as much her car

as mine. She used it all the time." One of the justices then asked the defendant: "When did she trade it in? What year was that?" The witness replied: "She traded it in for I think, a 1940 model, in the fall of 1939. It went from the date of the judgment three years. Nobody ever thought or worried about the car; never spoke to me about it. She traded it in for a 1940 model."

Defendant was then talking about the seized car. At page 1503 he gave the following testimony:

"Q. If it was an essential tool of your trade, why did you let her take it to Monroe? A. That was after, Mr. McCain.

"Q. When was that? A. She took it to Monroe in 1939 or 1940; probably in '38.

"Q. Was the car in Natchitoches in 1939? A. Oh yes.

"Q. In 1938? A. At times, yes.

"Q. In 1937? A. Yes, it was a 1934 model. It was bought in 1934 and used until about either '38 or '39.

"Q. Was it there in 1937? A. She traded it in for a 1940 model. She kept it until 1939.

"Q. Was the car in Natchitoches in 1937? A. Oh yes."

Defendant was attempting to show that he had held the car as keeper and that it was available and could have been sold in satisfaction of the writ at any time up to the date it was disposed of by his daughter in Monroe in the fall of 1939. But, after defendant testified before this court, additional testimony was taken before the Com-

missioner in Shreveport, where the Attorney General called as a witness Mr. Howard Crumley, who testified that his company sold to Mrs. Ernestine Cook, the daughter of the defendant, a new automobile on June 10, 1936, and took as a trade-in car a 1934 Chevrolet having Motor No. 4276619 and Serial No. 3DA05—23916, and having a 1936 Louisiana license No. 303—910. These motor and serial numbers corresponded exactly with those set out in Jones' petition for injunction. Mr. Crumley produced the records of the sale.

The defendant in his testimony before this court referred to only two cars—one, the new car purchased for him by the company in November, 1936, and the other, the seized car, which was a 1934 model, driven and used by his daughter. He testified unequivocally that the old car was used by his daughter until 1939, when it was traded in by her at Monroe for a new Chevrolet, 1940 model.

This testimony was given on November 11, 1941, on which date the hearing before this court was adjourned until December 1. On December 1, defendant was called back to the stand and was questioned and cross-questioned at length about matters not relating in any sense to the Rex Scott case, his testimony about these other matters covering some 45 pages. And, while nothing was being said about the Rex Scott case, the defendant said:

"Now, that reminds me. I want to bring back to your memory something about the automobile which you claim I sold. I want to tell the story of that automobile so that

the Court may get every bit of it." (Page 1625)

He was talking about the automobile which was seized. In his testimony which he had given on November 11, it was not denied that the Chevrolet automobile which he said his daughter traded in at Monroe in 1939 for a new 1940 model was the one which was actually seized by the sheriff. The sum and substance of his testimony was that, although that automobile was seized, yet it remained in and around Natchitoches until 1939 and could have been advertised and sold if the seizing creditor had desired to do so.

After making the remark quoted above, the defendant proceeded with a narrative which was a complete reversal and contradiction of the former testimony which he had given. He said that, when he entered the campaign in 1935, he bought a second-hand 1934 Chevrolet sedan, which gave him and his family two Chevrolet cars, each a 1934 model. He said he bought the second-hand car in the spring or summer of 1935 to use in his campaign, and that his daughter then kept the other 1934 model car. He said that, after the campaign was over, he told his daughter to keep the 1934 model "that we had bought when new and I kept the second-hand car and drove it in the campaign and drove it after, and the company bought for my wife and I to use a 1936 model Chevrolet of which we have a check here introduced where the cash money was paid for it". In his former testimony he mentioned the new 1936 model which was bought for him by his company, but said nothing about having purchased a second-

hand car for use in his campaign. In his testimony given on December 1, he said that the car which he turned over to his daughter, and which she later disposed of, could not have been seized by the sheriff because, at the time the seizure was made, that car was in Ouachita Parish in the possession of his daughter. He said that he thought the car which was seized was the 1934 model which he had bought in 1935 to use in the campaign.

This testimony relating to a third car is so manifestly an after-thought that we give no credence whatsoever to it. It was given about three weeks after the date on which he gave his former testimony, which former testimony is wholly inconsistent with that which he later gave. He offered no testimony to corroborate his second story.

In his former testimony as to the disposition of the seized car, he stated emphatically that it remained in and around Natchitoches until 1939. The Attorney General proved conclusively that the car was disposed of in Shreveport on June 10, 1936. Counsel for defendant evidently wrote their brief after the testimony was concluded. They attempt to explain the inconsistency between the statement of defendant and the facts proved by the Attorney General as to the disposition of the car by saying in their brief at page 13:

"Because the defendant testified that the automobile was traded in Monroe in 1939, does not show that the defendant wilfully testified falsely. The facts are that the 1934 model was traded to Howard-Crumley for a 1936 model, in Shreveport, and the 1936 model was traded in Monroe for a 1940 model."

But this theory is so utterly inconsistent with the testimony given by the defendant that it is not worthy of consideration.

According to the testimony of the defendant, the Chevrolet car, referred to as a family car and used by his daughter, was in and around Natchitoches continuously from the date of the seizure until the latter part of 1939. The Attorney General conclusively proved that defendant's daughter traded in a used car in the purchase of a new one in June, 1936. This is now admitted by counsel. So, if defendant's daughter used any car in and around Natchitoches after June, 1936, it was the new car. Defendant testified that he saw her using the car and that the car was used not only by his daughter but by him also. He therefore knew that the car they were using was not the same car which they had previously owned. It is inconceivable that he would not have noticed the difference.

When the testimony of the defendant as a whole is considered, the conclusion is irresistable that defendant knew that the seized car, which he said could have been advertised and sold by Scott if he had seen fit to do so, had in fact been placed beyond the reach of his creditor. Whether he sold the car in person or not makes no difference. He permitted it to be sold, and knew that it had been sold, after it was turned over to him as keeper or custodian by the sheriff.

We think the defendant was guilty of gross misconduct in connection with this entire matter.

The Wroten Court Reporter Case

In Articles 18-24, inclusive, of the Attorney General's supplemental petition, he charged, in substance, that the defendant had used his official power and authority to collect certain court reporting fees and had appropriated said fees to his own use and benefit.

The record shows that in October, 1938, the defendant employed Miss Margaret Wroten to work in his office and in the office of the Central Security & Title Company, a family corporation which was operated and controlled by the defendant. Miss Wroten was paid a salary originally of $50 per month, with the understanding that, if her services were satisfactory, her salary would be increased $5 per month until it reached a maximum of $75. Her salary was paid by checks issued by the Central Security & Title Company. A few months after she was employed and after her salary had reached $75 per month, the defendant appointed Miss Wroten as court reporter for Red River and Natchitoches Parish.

Miss Wroten testified that, when she was appointed court reporter by the defendant, the understanding was that she should continue to receive her regular salary of $75 per month as personal stenographer and secretary for the defendant and for the Central Security & Title Company, and that all the fees she received as court reporter were to be turned over to the defendant to be kept by him. She testified positively that, in cases where she received and kept any of her court reporting fees, the amounts so kept by her were deducted from her regular salary of $75 per month.

She testified further that later on she complained that her work was getting too heavy and that she was not willing to continue at the regular salary of $75 per month, and thought she should receive at least a portion of the court reporter fees. Thereupon, she said, an agreement was entered into between her and defendant by which she was allowed to retain one-fourth of the fees in addition to her regular salary, and the defendant should receive and keep for himself three-fourths of such fees. She said that this arrangement continued up to the time she resigned on April 15, 1940.

Her testimony to this effect was unequivocal. On cross-examination counsel for defendant questioned Miss Wroten as to whether the arrangement she had with the defendant about the court reporting fees was entirely satisfactory with her, and she said that it was. Apparently the purpose of counsel was to refute the Attorney General's allegation that defendant coerced Miss Wroten into making that arrangement. Counsel for defendant say in their brief: "This witness has never said Judge Jones or any corporation took one cent of money belonging to her."

But the pertinent point involved in the charge is not that the defendant was guilty of wrongful conduct toward Miss Wroten, but that it was gross misconduct for him to use his office in appointing a court reporter under an arrangement which would result to his own financial advantage.

The defendant testified positively that no such arrangement with reference to the court reporter fees, as testified to by Miss Wroten, was ever entered into, and that

neither he nor his company had ever received one cent of such fees. But Miss Wroten's testimony is corroborated by documentary evidence.

The Attorney General offered and filed in evidence eight cancelled checks, each payable to Miss Wroten as fees for her work as court reporter. Two of these checks, one for $3 and the other for $15.-35, are endorsed by Miss Wroten as follows: "Pay to the order of The Central Security & Title Co. Inc." Beneath Miss Wroten's signature is the following endorsement: - "The Central Security & Title Company Inc. By Jas W Jones, Pres".

One of the checks is for $23.45, made payable to B. B. Brazeale, Jr., and signed by Acme Drilling Company. This check is endorsed "Pay to order Miss Margaret Wroten B. B. Brazeale Jr." Beneath this endorsement is the following: "The Central Security & Title Co., Inc. by Jas W Jones Jr President", and beneath that endorsement is the following: "Pay to the order of The Central Security and Title Co. Margaret Wroten". Evidently Miss Wroten endorsed the check after it was endorsed by defendant for the company.

Admittedly these checks were presented and cashed by the defendant for the company of which he was president. Four of the checks, one for $7, one for $61.50, one for $15, and one for $3, are endorsed in blank by "Margaret Wroten". One of the checks, for $26, payable to Margaret Wroten, was not endorsed by her but was endorsed as follows:

"Margaret Wroten
　"By Jas W Jones Jr.
　　"Jas W Jones Jr"

Miss Wroten testified that the three checks which bear the endorsement of the Central Security & Title Company were turned over by her to the defendant under the arrangement which she had with him that he was to get the benefit of the court reporter fees. She testified further that, as to those checks which were endorsed by her in blank, she did not recall whether she collected the checks herself or whether they were turned over to the defendant and collected by him. But she testified positively that she did not get the benefit of the proceeds of any of the checks, and, further, that, in all cases where she collected the checks in person and kept the proceeds, the amount collected was deducted from her salary of $75 a month, which was paid to her regularly for the work which she did for the defendant personally and for the work which she did for his company.

The check for $26, dated May 10, 1940, payable to Miss Wroten, was issued about a month after she resigned and went to work in Monroe, Louisiana. That check, as we have said, was not received by Miss Wroten but was delivered by the maker to the clerk of court, who in turn delivered it to the defendant, who endorsed it as follows:

"Margaret Wroten
　"By Jas W Jones Jr.
　　"Jas W Jones Jr."

Admittedly Miss Wroten never saw this check, and she testified positively that

she had never received the proceeds of it. The defendant admitted that he cashed the check.

The defendant first testified that, after receiving the check, he carried it home, and that his wife told him that Miss Wroten had requested that the check be endorsed and cashed and that a portion of the proceeds be used to pay a small bill due by her for stationery, and that he thereupon endorsed and cashed the check and delivered the proceeds to his wife, who paid the stationery bill of some $5 or $6, and that she handed the remainder of the proceeds over to Miss Wroten's brother, with the request that he deliver it to Miss Wroten. According to the testimony which he first gave, he learned from his wife after he carried the check home that Miss Wroten owed the stationery bill. He testified subsequently that he took the check from the clerk of court in order to pay the small bill. While the defendant testified that a portion of the proceeds of this check was used to pay the bill for stationery, he did not state to what concern the amount was paid, nor did he produce the bill itself or a receipt for the amount paid. Nor did he call his wife as a witness.

He testified that his wife told him that she had given the balance of the amount to one of Miss Wroten's brothers to be delivered to her. Miss Wroten's brothers lived in Baton Rouge, and she lived in Monroe. He was asked whether he knew which one of her brothers received the money, and he said he did not. He was asked whether his wife took a receipt for the amount which she gave to Miss Wroten's brother, and he said he did not know. He was asked:

"Q. Did you inquire from your wife if she had gotten any receipts? A. No, but I will if you want it and she has the receipt, I will get it for you." (Page 1554)

Such was his testimony before this court.

Three weeks later, the defendant gave further testimony before this court. He was asked:

"Q. Have you found out where that money went to since you were here the last time? A. No, I have not discussed it with either of them, Mr. McCain.

"Q. You have not discussed it with your wife? A. No, sir." (Page 1710)

The testimony introduced by the Attorney General relating to the disposition of the proceeds of this check strongly corroborates the testimony of Miss Wroten that the defendant was to receive at first all of her court reporting fees and later 75 per cent of them. And, since the defendant had denied that either he or his company had ever received any portion of such fees and since he testified that he could get further information from his wife as to what was done with the proceeds of this check, it was his duty to get that information and give it to the court as he said he would do. The fact that he did not get that information and produce it raises the strongest presumption that he could not produce it. It was said in the case of Crescent

City Ice Co. v. Ermann, 36 La.Ann. 841, "The presumption is always and inevitably against a litigant who fails to furnish evidence within his reach", and said in Jones on Evidence, Volume I, Section 17, page 49, that "There is a recognized legal presumption that a party will produce evidence which is favorable to, him if such evidence exists and is available". Defendant says he made no effort to get further information.

Miss Wroten testified that, when she left Natchitoches, she owed no bills. The defendant's attempted explanation of the disposition of the proceeds of the $26 check is not corroborated, and is not satisfactory. The defendant was asked whether he did not request the clerk of court to get the $26 check cashed and to give him the cash instead of the check. He said he did not deny this. Just why he wanted the cash instead of the check may well be imagined.

The defendant gave no reasonable explanation as to why some of Miss Wroten's checks were handled by his company. His attempted explanation was that Miss Wroten was to pay back about $2.88 for each day she was absent from the office attending to her duties as court reporter, and that he supposed that these checks passed through the company's hands to take care of the amounts which she was to refund. Miss Wroten emphatically denied that any such arrangement was made. He further said that it might be that she was indebted to the company for room rent, and that she turned over the checks for that reason.

He was not positive about that. Miss Wroten testified positively that she never owed either the defendant or his company anything.

We find this rather remarkable statement at page 85 of the brief written by the defendant himself:

"If Miss Wroten did not receive these Court Reporting fees, who did receive them? If it was not her it was the Central Security and Title Company, Inc., and not the defendant. If they went to the company funds Miss Wroten put them there and the defendant had no knowledge of such. Is there a law to prohibit this company being the Court Reporter and be paid for the services rendered? We say there is no law against this company being the Court Reporter for the Court."

The testimony as a whole convinces us that the defendant did for a while receive the entire amounts due Miss Wroten as court reporter, and that for a time he received 75 per cent of them. And whether he received those fees personally or whether they went into the coffers of the Central Security & Title Company makes no difference, because the testimony shows that he was president and manager of that company and that he owned all the stock except a few shares which were issued in the names of members of his family. He therefore got the benefit of this arrangement with Miss Wroten.

A judge who uses his official powers to collect fees for himself or for a corporation owned by him and his family,

and which he manages and controls, is, in our opinion, guilty of gross misconduct.

## Worthless Checks

The Attorney General alleged, and the record shows, that during the defendant's tenure of office as judge he drew innumerable checks which the banks refused to honor on account of insufficient funds or because his account with the bank had been closed. These checks are referred to by the Attorney General as "hot" or "rubber" checks. Mr. O. W. Traber, assistant cashier of one of the three banks in the City of Natchitoches, who was called as a witness by defendant, testified on cross-examination that during the last eight or ten years his bank had turned down or refused to pay on account of insufficient funds at least 75 of the defendant's personal checks. The defendant did not deny this charge, but said that he had paid some of the "hot" or "rubber" checks which he had drawn, and expected to pay the others. But whether those checks have been paid or will be paid is not the point. It is gross misconduct for a judge to engage in the practice of drawing checks on a bank in which he has not on deposit funds with which to pay them and with which bank he has made no arrangement to carry his overdraft.

Mr. George C. Sutton, secretary-treasurer of the City of Natchitoches, testified that defendant issued a check for $27.40 on the City Bank & Trust Company of Natchitoches, dated January 4, 1939, payable to the City of Natchitoches for paving done by the city on the street in front of his home, and that this check was presented to the bank several times and each time dishonored. The defendant admitted drawing the check, but said he had finally paid it. The record shows that he did pay this check on June 11, 1941, which was nine months after the suit to remove him was filed and more than two years after the check was issued.

On July 3, 1937, defendant drew a check for $40, payable to Julius Aaron & Son, the check being given for building supplies received by the defendant. At the time the check was given, the defendant's account at the bank on which the check was drawn was closed. The check was left at the bank by the payee for 60 days, but no funds were deposited to cover it. This check was finally paid by defendant in July, 1941, 10 months after the removal suit was filed against him and four years after the check was issued.

The record shows that on May 15, 1937, defendant gave a check for $10.44 to A. A. Winbarg for groceries which he had purchased, which check was presented to the bank on which it was drawn and dishonored on May 20 and again on May 31. Winbarg wrote the defendant, notifying him that the check had been dishonored, and sent the letter by registered mail. The return receipt was signed by the defendant on June 29, 1937. The dishonored check, a copy of the letter written to defendant by Winbarg, and defendant's receipt for the registered letter were identified and filed in evidence in this case. This check was finally paid

by the defendant on June 14, 1941, which was seven months after the Attorney General filed the present suit to remove him from office and over four years after the check was issued.

Defendant was questioned about this check and said: "As soon as I found out it was issued and not paid, I went and paid it." And yet the record shows that he received notice that the check was unpaid on June 29, 1937, on which date he signed a receipt for the registered letter.

The record shows conclusively that the defendant made a practice of drawing checks on banks in which he had no funds or credit or on banks in which his account had been previously closed, and furthermore, that he repeatedly refused to pay the checks or make arrangements to have them paid when notified that they had been dishonored. The record shows further that he has paid some of his dishonored checks since the present suit was filed, in which suit one of the charges of misconduct was that he was in the habit of drawing "hot" or "rubber" checks.

In one case at least, the Winbarg case, the defendant's conduct was such as to subject him to conviction of a misdemeanor under Act No. 209 of 1914, which provides that failure to pay checks after 10 days' notice of dishonor is prima facie evidence of intent to defraud.

Defendant's habit and practice of giving worthless checks constituted gross misconduct not connected with his office.

### The Hunter Letter

In Article 82 of the Attorney General's original petition, he alleged that the defendant had habitually made a practice of using his office "and all personal means to prevent collection of his just obligations", and in support of that allegation he offered in evidence a letter, which in words and figures is as follows:

"April 10th, 1937.

"Hunter & Hunter, Attorneys,
 "First National Bank Building,
 "Shreveport, La.

"Dear sirs:

"Answering yours of recent date in regard to a note you state is held by A Mr. John R. Hunter, Sr., signed by me, will state—that Mr. Hunter does not hold a note signed by me of which he is the owner, and no such note is oweing by me.

"I wish to state that it appears that your attitude towards me has reached the point of 'nagging', and I am going to ask that your firm hereafter please refrain from annoying me, as I do not appreciate the past and am going to request that our business affairs be otherwise in the future.

"If you will please govering yourselves accordingly, it may avoid happenings that all of us may regret. This is a request.

 "Yours very truly,

 (Signed) "Jas. W. Jones, Jr.
 "Jas. W. Jones, Jr."

The defendant admitted that he wrote this letter, and it was proved that the letter was not sent through the mails but was

delivered to the attorneys Hunter & Hunter by John Gibbs, attorney-at-law, who had acted as defendant's attorney in many of the suits which had been filed against him.

At page 160 of the record, there is a stipulation agreed to between counsel for the State and counsel for defendant, which shows that the note referred to in the above quoted letter was for the sum of $743.80, dated October 17, 1932, and payable to bearer or holder; that said note "is the genuine note of James W. Jones, Jr., signed by James W. Jones, Jr." It was shown at the trial that the note was endorsed by John R. Hunter, of Alexandria, and, according to the stipulation written into the record, the note was placed in the hands of Hunter & Hunter, the attorneys to whom the above quoted letter was addressed by defendant, for collection. It was further shown that Hunter & Hunter, who held the note for collection, made a demand upon defendant for the payment of the note and that the letter above quoted was written by defendant in reply to the demands made for payment.

The defendant admitted at the hearing before this court that he had signed the note, that it was justly due and had not been paid.

At the hearing before this court, a photostatic copy of the letter was exhibited to defendant, who was asked whether he wrote it, and he said he did. In explanation as to why he wrote the letter to Hunter & Hunter, the defendant said:

(Interrupting) "In explanation of that note, I will state that the note was not payable to Mr. John R. Hunter and I had no idea that he ever got hold of that note. When they wrote me he had a note for collection I knew that I had signed no note payable to Mr. Hunter and I wrote him and told him that no such note existed." (Page 1520)

Defendant was then asked:

"Q. Your statement that there was no such note was not correct then? A. Payable to John R. Hunter; it is correct (meaning that his statement in the letter that no such note was due was correct)."

Apparently the explanation which defendant intended to make as to why he stated in his letter to Hunter & Hunter that "no such note is oweing by me" was that he had not signed a note payable to John R. Hunter. But defendant's letter itself shows that he understood that no demand was made upon him to pay a note which he had signed and made payable to John R. Hunter. The first paragraph of the Hunter Letter states:

"Answering yours of recent date in regard to a note you *state is held* by A Mr. John R. Hunter, Sr., signed by me, will state—that Mr. Hunter does not hold a note signed by me of which he is the owner, *and no such note is oweing by me.*" (Italics are the writer's.)

The defendant knew, of course, at the time he wrote the letter, that the note referred to was outstanding and unpaid, yet he stated that no such note was owing by him.

As shown by the record (page 1520), the defendant was asked why he sent such a threatening letter. His reply was:

"Mr. McCain, I did not want them nagging me so much. They had fought me in this Shreveport Long Leaf Lumber Company and I would like to have some peace at times from being continually just nagged by people that way."

Hunter & Hunter, who were trying to collect this note, were the same attorneys who represented the Shreveport Long Leaf Lumber Company in the suit already discussed in this opinion. The defendant was then asked:

"Q. Did you consider it nagging when a note that you had executed was long past due and never paid? A. They wrote me they held a note payable to Mr. John R. Hunter. I had signed no note like that."

As already stated, his own letter to Hunter & Hunter showed that they did not write him about a note "payable to Mr. John R. Hunter".

In their brief counsel for defendant have only this to say about the "John R. Hunter Note and Letter":

"During the preparation of this brief, we have read this letter five times and fail to find the threat in it. We do note the words, 'This is a request', and the statement that compliance with the request would avoid unpleasantness."

Counsel evidently overlook the following statement contained in the letter:

"If you will please govering yourselves accordingly, it may avoid happenings that all of us may regret."

This sentence followed the statement in the letter that "your attitude towards me has reached the point of 'nagging' ".

The defendant said nothing in his letter about "unpleasantness". On the contrary, he wrote into the letter a sentence which can be construed in no other light than as a veiled threat that, if these attorneys continued their "nagging" of him about his debts, there might be "happenings that all of us may regret".

The letter closed with the short sentence "This is a request". This statement is utterly inconsistent with the statement made in the sentence immediately preceding it. If the defendant, after stating in his letter to these attorneys that he thought their attitude toward him had reached the point of nagging, had stated that he was going to ask them to "please refrain from annoying me" and had said nothing more, the letter might be construed as a polite request. But he went further and warned them that, if they did not change their attitude toward him, there might be "happenings that all of us may regret".

Both the letter and the testimony of the defendant show that his attitude toward these attorneys was resentful and hostile because they were making, and had in the past made, demands upon him to pay debts which he now admits were just.

This letter illustrates the defendant's utter disregard of the rights of his creditors and disregard of his obligations. It shows that, when called upon to pay a just debt,

he is displeased, piqued, indignant, resentful. It shows that he has a feeling of animosity toward those who are disposed to take steps to enforce the payment of their claims against him. It illustrates the lengths to which he is willing to go in order to retard and finally escape the payment of his debts. He made a false statement in this letter when he said "no such note is oweing by me". He admitted on the stand before this court that he signed the note and that it had not been paid. He knew that, of course, when he wrote the letter.

When questioned about the letter, defendant did not deny that it was intended as a threat. He was asked why he "sent such a threatening letter", and he said, "I did not want them nagging me so much", and mentioned the Shreveport Long Leaf Lumber Company case, in which the same attorneys had represented the plaintiff in bringing the suit. In that case, he was sued on a note which he now admits that he owed. In that case he asked for, and was granted, an extension of time in which to pay. He did not pay, and Hunter & Hunter filed suit for their client. Defendant now says they were "nagging" him.

██ We think defendant's writing of this letter constituted gross misconduct.

We think the charges of gross misconduct were proved in connection with the following matters: (1) The so-called Cooley Letter; (2) The Shreveport Long Leaf Lumber Company Case; (3) the Rex Scott Case; (4) the Wroten Court Repor-ter Case; (5) the habitual giving of worthless checks, and (6) the writing of the Hunter Letter.

██ For the reasons assigned, it is adjudged and decreed that the defendant, James W. Jones, Jr., Judge of the Tenth Judicial District Court for the Parishes of Red River and Natchitoches, has been guilty of gross official misconduct and of gross misconduct not connected with his office, and it is ordered that he be, and he is hereby, removed from his office. It is further ordered that he pay all costs of this proceeding.

HIGGINS, Justice (concurring in the decree).

The grounds upon which the removal of the defendant is sought are based upon numerous alleged acts of incompetency and misconduct said to have transpired at various times, over a period of many years. The defendant denies that he is guilty of any wrongdoing and avers that he is innocent of the charges made against him. In his testimony he categorically denied that he had either personally or officially misbehaved himself in any way which would justify his removal, and stated that all of the charges set forth in the petition were a rehash of matters that had been time and again called to the public's attention when he was a candidate on several occasions to succeed himself, and that all of this trouble was founded upon political partisanship.

The most serious charges, such as accepting bribes, defrauding the State of money by presenting padded expense accounts,

defrauding the Parish of Natchitoches of its funds by illegally charging private telephone calls against the Police Jury's account, were not proven. A great deal of the testimony with reference to many other charges of misconduct is biased and prejudiced and characterized by exaggeration. The defendant, when he testified before this Court, stated that, if he had fallen into any error, it was not wilful or intentional on his part, and that he acted to the best of his judgment. Even if the defendant is credited with having acted in good faith, there is sufficient testimony corroborated by documentary evidence involving his official acts that shows his incompetency.

For these reasons, I concur in the decree.

FOURNET, Justice (concurring).

This original proceeding was instituted in this court by the Attorney General of the State of Louisiana, Eugene Stanley, under the provisions of Section 5 of Article IX of the Constitution of 1921 to have James W. Jones removed from his office as Judge of the Tenth Judicial District for the parishes of Red River and Natchitoches.

The petition is lengthy, comprising some 110 articles, and charges the defendant with having committed every act for which he may be removed other than habitual drunkenness. Specifically these charges are that the defendant (1) accepted as bribes certain sums of money tendered him for the purpose of influencing him in the conduct and performance of his official duties—i. e., (a) the sum of $200 from Guy Sherrill for favorable decision in three cases in which the Marble Savings Bank and a Sam Lacaze were interested parties, (b) a further sum of $100 from Guy Sherrill when these cases were before the defendant on rehearing, (c) the sum of $1,000 from Malcolm Bahcall through Irve J. Spence when Bahcall's case was before the grand jury on a manslaughter charge, (d) the sum of $25 and the assistance of the Mondello family for the early hearing of the case of State v. Joe Mondello and the imposition of the maximum sentence in the event of conviction, and (e) a mortgage in the amount of $300 on the Cooley farm in Natchitoches Parish for the imposition of a parish jail instead of a state penitentiary sentence in the case of State v. Rufus Cooley—; (2) padded and rendered false statements of his expense account in order to collect the maximum amount allowed judges for travelling under Act No. 206 of 1926; (3) obtained money illegally from the parish by having his private telephone charges billed to and paid by the Police Jury of the parish; (4) illegally discharged a grand jury panel when his orders to select a grand jury panel from names chosen by him and handed to the Jury Commission were disregarded; (5) was guilty of official misconduct in handling a case involving a contest over the 1936 elections, when his own election was being contested; and (6) was guilty of misconduct in connection with certain other matters, referred to as (a) the writing of the "Cooley Letter," (b) the Shreveport Long Leaf Lumber Company v. Jones case, (c) the Rex Scott case, (d) the Wroten Court Reporter Case, (e) the writing of the

"Hunter Letter," and (f) in the drawing of worthless checks.

The defendant in his answer categorically denied that he was guilty of any misconduct justifying his removal. He contended this suit grew out of pledges made during the recent gubernatorial campaign, most of the charges being merely a rehash of matters that had been called to the public's attention every time he had offered himself as a candidate for the office of Judge of the Tenth Judicial District.

As found by the majority opinion, the most serious charges against the defendant (the first five listed above) were not sustained by the record. In this I not only concur, but I am of the further opinion that these charges have no foundation in fact; in truth they should have never been made the basis of a petition for the removal of the defendant.

While it is true that the record strongly indicates, as was contended by the defendant, that a great number of the witnesses procured against him were biased and prejudiced, the majority having been motivated by personal or political enmity and many others either being employed by the state at the time their testimony was given or having been so employed subsequent thereto, and while it is also true that the defendant's removal would not be justified for any single one of these less serious charges (listed under No. 6 above), particularly since the evidence in support of some of these charges is not clear and convincing and others involve the defendant's conduct during heated political campaigns, nevertheless, I think that when these

charges are taken as a whole, the defendant's conduct warrants his removal and I therefore concur in the results.